**Stone County Division of Family Services, Respondent– Respondent.**

Nos. 21580, 21598.

Missouri Court of Appeals, Southern District, Division Two.

May 11, 1998.

George L. Gundy, Reeds Spring, for Petitioner–Appellant.

Randall S. Anglen, Branson, for Intervenors–respondents.

SHRUM, Judge.

In this dissolution of marriage case, the trial court found that neither G.M.A., Jr (Father) nor R.J.A. (Mother) are was "fit, suitable or able to be custodian of" their minor

child L.L.S.A. (Daughter). Additionally, the trial court denied the paternal grandparents' (Intervenors') request for custody of Daughter. Thereon, the trial court added the Stone County Division of Family Service (DFS) as a third party after the case was under advisement and awarded custody of Daughter to DFS.

In No. 21598, Intervenors appeal. They assert that the trial court made three errors in its custody adjudication. First, Intervenors claim that the trial court's refusal to award them custody of Daughter was against the weight of the evidence. Second, they argue the trial court committed reversible error in joining DFS after trial as that denied all parties their constitutional rights to due process. Finally, Intervenors assert that the trial court erred when it gave DFS permanent custody as DFS is not statutorily authorized to take custody of children in a dissolution of marriage action. We find merit in Intervenors' third point but not their first. Because Intervenors' third point has merit, we need not and do not reach their second point.

In No. 21580, Mother appeals. She assigns two reasons why the trial court erred in its custody award. First, she contends the trial court violated her constitutional right to due process by not giving her prior notice that it was considering DFS as a permanent custodian for Daughter and by not letting her be heard on that issue. Second, she argues that the trial court's finding that she was "unfit, unsuitable or unable to exercise custody over [Daughter] was against the weight of the evidence."

Mother's first point is moot because of our decision in No. 21598 that DFS is not statutorily authorized to take custody of Daughter in this dissolution case. We find that Mother's second point lacks merit.

We reverse and remand that part of the judgment that placed custody of Daughter with DFS. In all other respects, we affirm the judgment.

## PROCEDURAL HISTORY AND BACKGROUND

Mother filed her petition for dissolution of her marriage in Stone County, Missouri, in June 1995. Father and Mother were married in 1987, and separated in April 1994. One child, Daughter, was born of the marriage in July 1991. Moreover, during the marriage Mother had custody of two other children, one from a previous marriage, L.O., born in 1983, and R.B., born in 1984 (the latter apparently out of wedlock).

In her petition, Mother prayed for "custody" of Daughter. Father filed a counter-petition in which he asked for sole custody of Daughter or, in the alternative, that Daughter be placed with Intervenors. Pursuant to Father's motion, a guardian ad litem was appointed. In addition, Father moved for temporary custody, or in the alternative, temporary custody with Intervenors. Intervenors, residents of Kansas City, Kansas, filed a motion to intervene which was granted. Intervenors then filed a motion for "custody, or in the alternative, visitation pendente lite."

The trial court held a temporary custody hearing. After the hearing, the trial court placed Daughter in the temporary custody of the DFS.

Trial of the dissolution case began on April 26, 1996, but was not concluded that day. Additional evidence was adduced on April 29, May 23, and June 24, 1996. During the trial, the guardian ad litem recommended that physical custody of Daughter be awarded to Intervenors.

Evidence from many witnesses, including the parties, established that Father and Mother used alcohol and illicit drugs both before and after marriage. After marriage, both parents frequently used marijuana in the presence of Daughter and the other children. Evidence also established that during the marriage the parties, Daughter, and other children lived in filthy conditions in a mobile home infested with fleas, roaches, and animal feces. There was considerable evidence that physical, sexual, verbal, and mental abuse were ongoing problems in this dysfunctional family. The trial court took the case under advisement July 29, 1996.

On February 15, 1997, the trial court entered its judgment. The trial court made

detailed findings of fact and conclusions of law in which it specifically found that neither Father nor Mother was "fit, suitable or able to be custodian of [Daughter]," and that it was not in Daughter's best interests to be in the custody of either parent. The court granted Father and Mother supervised visitation.

Continuing, the trial court found that it would be in Daughter's best interests to grant custody to a third party. In considering third-party placement, the court concluded that Intervenors' "expressions of animosity toward Mother and her family are not in [Daughter's] best interest," and refused to award custody to them. Upon noting that DFS had actual custody of Daughter since December 14, 1995, the trial court awarded custody of Daughter to that agency. These appeals followed.

### DISCUSSION AND DECISION

*Point II: Mother's Appeal—Error in Not Awarding Mother Custody*

■ Initially, we address Mother's claim in No. 21580 that the evidence does not support the trial court's finding that she was "unfit, unsuitable and unable to exercise custody over [Daughter]." We review this point with the following principles in mind.

■ A trial court has broad discretion in deciding child custody but always the best interests of the child are the ultimate concern. *J.L.S. v. D.K.S.*, 943 S.W.2d 766, 775 (Mo.App.1997). Great deference is given a trial court's decision when custody of a minor child is involved. *In re Marriage of Berger*, 950 S.W.2d 307, 309–310[3] (Mo.App.1997).

■ Upon review, this court presumes that a trial court awards custody with the child's best interests as its ultimate concern. *Id.* at 310[4]. This presumption arises because of the trial court's superior position to judge the credibility of witnesses and their character, sincerity, and other intangibles that might not be completely shown in the cold record. *Id.* A trial court is free to believe or disbelieve all, part, or none of any witness' testimony. *Id.* at 310[5]. Moreover,

an appellate court will accord a trial court's decision in custody matters greater deference than in other cases. *Id.* at 310[6].

■ In ascertaining the best interests of a child, a trial court may consider the conduct of the parties. *In re Marriage of Campbell*, 868 S.W.2d 148, 153[15] (Mo.App. 1993). Consideration must be given to what conduct a parent may inspire by example, or what conduct of a child a parent may foster by condonation. *M. v. M.*, 688 S.W.2d 384, 386[3] (Mo.App.1985). Both past and present actions may be reliable guides to the priorities of a parent. *Id.* Consideration of a parent's behavior is not limited to that which has in fact detrimentally affected the child. *Id.*

■ Although not specifically listed as a factor in § 452.375,[1] morals are a relevant consideration in deciding whose custody will serve the best interests of the child. *Berger*, 950 S.W.2d at 310[9].

"A mother's conduct of affairs with the knowledge of children and while they are present in the house has been held to be a critical factor in denying her custody. 'Private personal conduct by a parent which could well have an effect on children during the years in which their character, morality, virtues and values are being formed cannot be ignored or sanctioned by courts.' "

*Jones v. Jones*, 937 S.W.2d 352, 356 (Mo.App. 1996) (citations omitted).

Taking the evidence favorable to the judgment on this issue, as we must do upon review, *Rogers v. Rogers*, 786 S.W.2d 176, 177 (Mo.App.1990), there was evidence that Mother was a frequent user of illicit drugs during much of the marriage. Her drug usage included crystal "meth," hallucinogenic mushrooms, "L.S.D.," and marijuana. Many drugs, especially marijuana, were used in the presence of all the children. There was evidence that Father had encouraged and allowed L.O. and R.B. to smoke marijuana in the home. The court could reasonably have inferred that such conduct was in the presence of Daughter. Although no direct evi-

---

1. All statutory references are to RSMo 1994, unless otherwise indicated.

dence exists that Mother gave L.O. or R.B. marijuana, it would have been reasonably inferable that she condoned such activity.

There was evidence that Mother would not take responsibility for her own actions. For example, Mother admitted that she abused various controlled substances including L.S.D.; yet, she accused Father of surreptitiously putting L.S.D. in her food. Mother complained of Father's constant abuse of her and the children; yet, she stayed with Father and thus continuously exposed her children to this abuse because allegedly no one ever told her how to get out of an abusive relationship. For years, Mother and her children lived in a home that was filthy and vermin infested and the children and their clothing were often filthy. Yet, Mother blamed Father and her children for these conditions while simultaneously admitting she had assumed responsibility for housekeeping.

Undisputed evidence established that Mother had been sexually molested by her step-father when she was thirteen or fourteen years old. From this and related evidence the trial court could have found that Mother was adversely affected emotionally by that abuse. Moreover, a court in Kansas permitted Mother's step-father to visit certain other grandchildren only when supervised; yet, Mother repeatedly insisted that her children, including Daughter, were perfectly safe with her step-father.

The record contains evidence that Mother repeatedly prevented her other children from visiting their fathers. She claimed her first husband sexually abused his daughter, L.O., when she was eighteen months old. Twice Mother was cited for contempt of court for not allowing L.O. to visit with her father or his family. There was evidence that Mother did not keep R.B.'s father apprised of his son's whereabouts.

In 1994, Mother accused Father of sexually assaulting L.O. As a result, Father was charged with multiple criminal offenses involving L.O. After spending many months in jail, Father was tried and acquitted. There was evidence that the filing of these charges against Father and his subsequent acquittal created animosity between Father and Mother and between their respective families.

Mother's testimony constantly painted a picture of herself as a victim. Mother's testimony about Father included this: (a) he forcibly sodomized her in the presence of the children, (b) he constantly abused her physically and mentally throughout the marriage, (c) he verbally and physically abused L.O. and R.B., (d) once Father destroyed L.O.'s and R.B.'s favorite toys as they watched, (d) Father broke the neck of L.O.'s favorite cat in her presence, and (d) Father took Daughter to the house of a marijuana supplier and while there, Daughter was viciously attacked and severely injured by a pit bull dog. Despite this type of conduct—which is only illustrative of monumental evidence of abuse in the record—Mother continued to live with Father until she claimed that Father raped her daughter, L.O.

On this record, the trial court could reasonably have inferred that Mother stayed with Father and submitted herself and these children to unspeakable conditions to get drugs. Moreover, such evidence tended to show that Mother had problems with co-dependency as the trial court found. While Mother had taken some steps to obtain help for her problems, there was ample evidence to support the trial court's finding that Mother's co-dependent tendencies would cause her to gravitate toward other abusive relationships in which she would, again, be unable to protect herself or Daughter. Also, the trial court was entitled to disbelieve Mother's testimony that she had wholly "kicked" her drug addiction on her own and without treatment. *In re Marriage of Pobst,* 957 S.W.2d 769, 772[4] (Mo.App.1997).

The parental presumption favoring custody by the natural parent succumbs when it conflicts with the best interests of the child. *Cotton v. Wise,* —— S.W.2d ——, —— (Mo.App.E.D.1998), 1998 WL 60880, No. 72433, slip op. at 5, (Feb. 17, 1998). After careful review of this record, we are not firmly convinced that third-party placement of custody of Daughter was against the weight of the evidence. *Murphy v. Carron,* 536 S.W.2d 30, 32[1] (Mo.banc 1976); *Rogers*

*v. Rogers,* 786 S.W.2d at 177. Mother's point is denied.

## Point I: Intervenors' Appeal–Refusal of Custody to Intervenors

After denying Father's and Mother's requests for custody, the trial court found that it was in Daughter's best interests that she be placed with a third party as authorized by § 453.375.5(a). However, it refused to place Daughter with Intervenors, saying:

"With some hesitation the GAL recommended placement with Intervenors. Her list of concerns in this regard also concern the court which, in addition, has no evidence showing that Intervenors would do a better job of parenting with their granddaughter than they did with their own son. Their expressions of animosity toward Mother and her family are not in the child's best interest."

In No. 21598, Intervenors' first point relied on charges the trial court's judgment denying their request for custody of Daughter was against the weight of the evidence. They argue that "[t]here is no evidence that [Intervenors] ever expressed any animosity toward Mother and her family in the presence of [Daughter], nor anywhere else besides the courtroom, where they were compelled to tell the truth under oath." Continuing, Intervenors argue that there was "overwhelming evidence that [Intervenors] would insure meaningful contact with both parents and families...."

For the most part, Intervenors' argument simply recounts evidence favorable to their position, argues inferences from that evidence, and then asks this court to rule contrary to the trial court. Evidence in the record, however, supports the trial court's judgment.

The public policy of Missouri is to "assure children frequent and meaningful contact with both parents after the parents have separated or dissolved their marriage...." *See* § 452.375.4. Also, courts must consider several relevant factors in § 452.375.2(1)-(8) when deciding "custody in accordance with the best interests of the child." Of those factors, three are directly related to the policy of "frequent and meaningful contact." Thus, § 452.375.2(6) mandates consideration of "[t]he needs [of children] for a continuing relationship with both parents...." Section

452.375.2(7) requires consideration of whether "either parent [intends] to relocate his residence outside the state." Also, § 452.375.2(8) directs that regard be given to "[w]hich parent is more likely to allow the child frequent and meaningful contact with the other parent."

Although the trial court was persuaded that placing custody with Mother or Father was not an option, it continued to focus—correctly so—on the "frequent and meaningful contact" policy of this state. In addressing § 452.375.2(6), the court found:

"[B]oth parents say they are willing, but only Mother has demonstrated any willingness to perform her functions as a parent. The child's needs for a continuing relationship with her parents are a continuing concern and should be monitored closely through her counselling and should be promoted through frequent supervised visitation."

The trial court also found that "Mother and Father were each emotionally attached" to Daughter. Trying to meet the "continuing relationship" needs of Daughter via supervised and monitored visits, the court awarded Father and Mother visitation "[a]s often as practicable, so long as the visitation is supervised by DFS...."

After thus providing for Daughter's "continuing relationship" needs, but also requiring that her contacts with Father and Mother be supervised, the trial court was obviously concerned that placement with Intervenors would not work. In considering § 452.375(7), the trial court noted that Intervenors lived out of state in Kansas City, Kansas. The court could reasonably have concluded that Mother's small income, her custodial responsibilities for two other children, and travel distance from Stone County to Kansas City, Kansas (250 miles) would effectively preclude meaningful "reasonable visitation" for Mother if Intervenors had custody.

Also, the court could reasonably have concluded that supervised parental visitation in Intervenors' home was not an option here. First, DFS supervision in Intervenors' home was not feasible. Second, when the trial

court considered who was most likely to "allow frequent and meaningful contact" per § 452.375.(8), it specifically found a "continued animosity between Mother and Father and their families, which will likely remain a problem when it comes to [Daughter's] ability to establish relationships with family members." With that finding made, placing Intervenors in control of parental visits was hardly an option.

In making these observations, we have considered Intervenors' testimony that, if awarded custody of Daughter, they would make sure that Daughter had a meaningful relationship with both Father and Mother. They also denied bearing any animosity toward Mother. Yet, the trial court was entitled to disbelieve such testimony, which it obviously did. *Pobst*, 957 S.W.2d at 772[4].

Concerning Intervenors' testimony that they never expressed animosity toward Mother and her family in the presence of Daughter, such testimony—even if believed—is not determinative. The relevant inquiry is whether evidence exists from which the trial court could reasonably have inferred that placement of Daughter with Intervenors would preclude a meaningful relationship between Mother and Daughter. Such evidence is in this record.

To illustrate, there is Mother's testimony that she was concerned that Intervenors "would turn [Daughter] against [Mother] and [her] other kids as well." Additionally, when Mother talked to Intervenor–Grandmother about divorcing Father, she was told: "[I]f I divorced her son I wouldn't have my kids … I wouldn't having nothing, I'd be living in the streets." When asked to describe her relationship with Intervenors, Mother answered: "There isn't one." Mother's accusations that Father had sexually abused L.O. led to multiple charges of rape and sodomy being lodged against him. As a result, Father was jailed from April 1994 until his acquittal in January 1995. Father testified Mother accused him of this criminal conduct less than a week after he told her he wanted a divorce and after he asked his mother (Intervenor–Grandmother) for money to hire a lawyer. Intervenors attended Father's criminal trial and at its conclusion, an angry exchange

occurred between Intervenors and members of Mother's family. Members of Intervenors' family testified that it was Mother's stepfather—not Father—who had sexually molested L.O. Civil lawsuits are pending that involve members of Father's and Mother's respective families. Also, once Father was acquitted of assaulting L.O., Mother "went into hiding" for several months. Daughter was with Mother during this "hiding" period. Consequently, Intervenors were unable to visit with Daughter for some time. During that "hiding" period, Intervenors mounted a massive effort to find Daughter and Mother. Their efforts included contacting several law enforcement agencies, the attorney general of and governor of Missouri, and hiring private counsel.

At trial, Intervenors repeatedly criticized Mother's parenting and housekeeping practices. Intervenor–Grandmother recounted one instance where she and Mother had "words" over Mother's abusive treatment of L.O. Moreover, Intervenor–Grandmother did "[e]verything [she] could" to keep Daughter away from Mother's step-father. This effort stemmed from her belief that Mother's stepfather would molest Daughter. Intervenor–Grandmother formed this belief because the step-father freely admitted he had molested Mother in her early teenage years. Moreover, Intervenor–Grandmother recounted two instances in which the step-father had groped and assaulted her. Intervenor–Grandfather blamed Mother for the filthy home conditions, saying: "[I]f a man [works] 14, 16 hours a day, six, seven days a week … you'd think the woman that wasn't doing something would take care of it. And it ain't his job to come home and [clean house] every night.…"

This and other similar testimony in this sordid saga supports the trial court's conclusion that it was not in Daughter's best interests that she be placed with Intervenors. The trial court could reasonably have inferred that existing family animosities rendered it impossible for Daughter to have meaningful contact with Mother through supervised visitation if Daughter was in Intervenors' home. We are not firmly convinced that the trial court's refusal to award custody to Intervenors is against the weight of the

evidence. *Murphy,* 536 S.W.2d at 32[1]; *Rogers,* 786 S.W.2d at 177. Intervenors' first point is denied.

### Point III: Intervenors Appeal–Authority For DFS to Take Custody

█ Intervenors' third point in No. 21598 contends the trial court erred in awarding custody of Daughter to DFS. Intervenors argue that the statute that defines the powers of DFS does not empower it to take custody of a child in a dissolution case.

█ DFS is an administrative agency. "Administrative agencies have only those powers granted them by statute and no more." *Wheeler v. Board of Police Comm'rs,* 918 S.W.2d 800, 803[4] (Mo.App.1996). Regarding the power of DFS to take custody of children, § 207.020(17) states in part:

"To accept for social services and care, homeless, dependent or neglected children in all counties where legal custody is vested in the division of family services by the juvenile court where the juvenile court has acquired jurisdiction pursuant to subdivision (1) or (2) of subsection 1 of section 211.031, RSMo; provided that prior to legal custody being vested in the division of family services, the division of family services shall conduct an evaluation of the child, examine the child and investigate all pertinent circumstances of his background for the purpose of determining the appropriate services and a treatment plan for the child."

As the western district of this court has recognized, DFS has "no statutory sanction to take third party custody of a child in a dissolution action." *Rogers,* 786 S.W.2d at 178.

█ Here, the trial court faced a dilemma. Once it decided that Daughter's best interests would not be served by placing her with Mother, Father, or Intervenors, there were no other parties to the litigation. Accordingly, the trial court turned to DFS, the agency first implicated when the trial court temporarily placed custody of Daughter with DFS on December 14, 1995. We note that none of the parties objected when that temporary custody order was entered. Yet, that does not alter the fact that DFS is not statutorily empowered to receive third-party cus-

tody in a dissolution of marriage case. *See Rogers,* 786 S.W.2d at 178; § 207.020.

Under the circumstances, Daughter is a child under the age of seventeen years "otherwise without proper care [or] custody." *See* § 211.031.1(1)(b). *See also* § 211.021(2). Thus, the juvenile court of Stone County would have "exclusive original jurisdiction" over a proceeding involving Daughter's custody.

As to that part of the judgment that places permanent custody of Daughter in the Stone County Division of Family Services, we reverse and remand with directions to the trial court that it promptly notify the juvenile officer of Stone County that Daughter is a child under the age of seventeen years, living in Stone County, Missouri, who needs care and treatment because she is without proper care or support pursuant to a valid order of any court. We also note that the trial court's "Interlocutory Judgment" of December 14, 1995, placing temporary custody of Daughter with the Stone County Division of Family Services remains unchallenged.

In all other respects, the judgment of the trial court is affirmed.

PARRISH, P.J., and BARNEY, J., concur.

