**Cliff Mark STOLLER, Respondent,**

v.

**Julie Ann STOLLER, Appellant.**

No. SD 30395.

Missouri Court of Appeals, Southern District, Division Two.

Jan. 18, 2011.

Larry A. Tyrrell, Springfield, for Appellant.

Devon F. Sherwood, Springfield, for Respondent.

WILLIAM W. FRANCIS, JR., Judge.

Julie Ann Stoller ("Mother") appeals a judgment of the trial court awarding her joint legal and physical custody of minor child ("Child") with Cliff Mark Stoller ("Father"). We affirm the judgment of the trial court.[1]

### Factual and Procedural History

On July 27, 2007, Father and Mother married. On March 28, 2008, Child was born to Mother and Father. After a brief and stormy marriage, Mother and Father separated on November 11,2008.

During their marriage, Father was the primary caregiver for Child, and Mother worked full time. Following Child's birth, Mother struggled with post-partum depression and anxiety, but was hesitant to take medication because she felt it was important for Child to be breast-fed. Mother went to the hospital in May 2008 after a panic attack. Mother felt overwhelmed because she had to feed Child during the night. Father cited his sleep apnea as preventing him from helping with Child at night. Mother was resentful Father was sleeping through the night and that he did not interrupt his normal night routine to help care for Child. Mother was also bitter Father was allowed to stay home and tend to Child but as soon as she came home, he would "hand her [Child]" to care for while he went to exercise four or five times a week.

On November 11, 2008, the couple had an intense argument over a bottle-feeding incident which resulted in Mother leaving the house. When Mother did not return immediately, Father called the police to report Mother missing. He had discovered broken glass and that, combined with "suicidal comments" he recalled Mother making throughout the day ("I'd rather be dead than live like this" and "I'd rather be dead"), caused him to become alarmed. Mother had actually driven to a nearby church parking lot, called her mother, and then returned home approximately an hour later. When Father called police to inform them Mother had returned, Mother started screaming because he had involved the police. The police then sent someone to check on the domestic dispute. Upon arrival, an officer concluded one of the parties should leave the residence for the remainder of the night. Mother left with Child and went to her mother's home in Mt. Vernon.

Subsequently, Mother and Father filed petitions for dissolution of marriage. In their respective petitions, each requested sole legal and physical custody of Child. The cases were consolidated at a hearing on December 3, 2008, and Mother was given temporary custody, provided she and Child reside with the maternal grandparent. Mother initially resisted allowing Father to see Child.

---

1. Our use of the term "trial court" is meant to represent the proceedings conducted before Family Court Commissioner Sue Crisman ("Commissioner") on January 13, 2010, whose findings were subsequently adopted by Judge Jason R. Brown and the Circuit Court of Greene County on January 22, 2010.

At a hearing on December 19, 2008, a new contact schedule and other temporary orders were entered, both parents were ordered to obtain psychological evaluations, and Linda Thomas was appointed Child's new Guardian ad Litem ("GAL").

After the trial court ordered frequent day-long visits for Father with Child, the couple continued to have problems at custody exchanges. At one exchange at a police station, Father would drive his car to where Mother's car was located and she would then drive to another location on the lot. When he approached again, Mother again moved her car. At another exchange, Mother insisted on meeting at a deserted church parking lot, but never appeared for the meeting. Mother repeatedly changed the times of exchanges, cancelled visits, or just refused to give Child to Father.

On April 28, 2009, Mother filed a "Petition for Protection Order" based upon the allegation Father shoved her at a custody exchange. On May 7, 2009, a "Full Order of Protection" was entered against Father, to expire on November 7, 2009. The protection order permitted the couple to meet concerning Child.

In a subsequent exchange at an insurance office, Father's mother accompanied him. Upon his arrival, Mother insisted Father speak with her alone in an adjacent conference room and refused to relinquish Child until he did so. Father declined because of the order of protection; he was only there to receive Child. He then told his mother they should leave as Mother was not going to give Child to him. He told Mother this was a denial of his visitation to which she responded she felt threatened and was going to call the police. Police arrived and ticketed Father for being in violation of the order of protection, although it was Mother who requested the private conference and the order of protection allowed the couple to meet concerning Child. Mother knew the trial court's order permitted the couple to meet concerning the child, but did not inform the officer and Father was then arrested. Mother voluntarily dismissed the Full Order of Protection on September 29, 2009.

Mother also had confrontations with third parties during exchanges. For example, at one exchange at a McDonald's she screamed at Father's mother, "You stupid old woman. You stole my house and all my belongings." To the McDonald's staff Mother yelled, "If these people come in here again, call the police and have them arrested." At another exchange when a babysitter was present, Mother grabbed Child from the babysitter's arms, threw him over her shoulder and yelled, "Give me my child." At the next exchange, Mother called law enforcement and caused the babysitter to be arrested for unpaid traffic tickets.

On June 17, 2009, an "Amended Parenting Plan" was ordered in which Father was awarded physical custody for multiple overnight visits. All exchanges were to take place at a police station. On August 20, 2009, a "Second Amended Parenting Plan" was entered with similar provisions. Even after Father's custody progressed to overnight parenting time, the exchanges continued to be problematic.

Despite continuing problems at exchanges, Mother is very caring and nurturing of Child and keeps a clean apartment. She also showed responsible parenting in some areas by keeping WIC and doctor appointments, seeking guidance for Child's minor health problems, and holding full-time employment.

Father has taken an active role in parenting. He took Child to physical therapy sessions; sought guidance about parent-

ing; and takes Child to the park, water skills training, doctor's visits and the WIC office.

On January 13, 2010, a trial was conducted. Ten witnesses testified regarding the events documented above.

Specifically, Father testified Mother argued with him during custody exchanges; made it difficult for him to see Child; called him names; yelled at his mother; exposed Child to cold weather in inadequate clothing; caused Child to not want to go to her during custody exchanges; made "suicidal comments"; got upset when Child cried; and was depressed and had been hospitalized during Memorial Day weekend of 2008.

Father also testified he believed it was very important for Mother to see Child and would even be agreeable to visitation beyond the periods specifically awarded.

Danielle Geif, a babysitter hired by Father, also testified. Ms. Geif described the custody exchanges she witnessed as "very hostile, very angry, very forceful." She also noted that when Child did not want to go to Mother, Mother very forcefully grabbed Child.

Mother testified she was frustrated with Father's controlling behaviors and continued lack of support. She also stated Father shoved her during a visitation exchange on April 24, 2009. This allegation led to the granting of the Full Order of Protection against Father.

Dr. Mark Bradford's psychological evaluations were also entered into evidence. Although Dr. Bradford had recommendations concerning Mother and Father, he concluded both easily met the minimum

parenting standard. He noted both Mother and Father exhibited narcissistic tendencies, which tended to make it difficult to compromise and work with each other.

The GAL testified that while she did not have a firm recommendation, she had some observations, which were based on the eight statutory factors as set forth in section 452.375.2(1)–(8).[2] A portion of her observations were that joint legal and physical custody was preferred if the trial court determined that Mother and Father were able to participate in this type of arrangement.

On January 22, 2010, a judgment was entered awarding each party joint legal custody and joint physical custody of Child, with Father's address designated as Child's address for mailing and educational purposes. The trial court's parenting plan designated Mother to receive parenting time every other weekend from Friday at 6:00 p.m., until Sunday at 6:00 p.m.; every Wednesday from 4:00 p.m., until 7:30 p.m.; alternating holidays; and three weeks during the summer—consisting of one week each during June, July and August. This appeal followed.

Mother contends the trial court erred in awarding her "limited physical custody" of Child because there was no substantial evidence to support such a limited physical custody award in that the best interests of Child require a more extensive physical custody award for Mother.[3] The sole issue for determination is whether there is substantial evidence to support the trial court's parenting plan as being in the best interest of the Child.

---

2. All references to statutes are to RSMo 2000, unless otherwise indicated.

3. Father did not submit a brief on appeal. While there is no penalty for that omission, this Court is then forced to adjudicate Mother's claims of error without the benefit of whatever arguments Father might have raised. *McClain v. Kelley,* 247 S.W.3d 19, 23 n. 4 (Mo.App.S.D.2008).

## Standard of Review

Because this is a court-tried case, we must affirm the decision of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976).

 When reviewing a child custody case, the decision of the trial court is given greater deference than in other cases and this Court "will not overturn the trial court's findings unless they are manifestly erroneous and the child's welfare compels a different result." *Hueckel v. Wondel,* 270 S.W.3d 450, 453 (Mo.App. S.D.2008). We will not substitute our judgment for that of the trial court so long as credible evidence supports the trial court's beliefs. *Id.* We presume that all evidence was considered by the trial court and view the evidence in the light most favorable to the trial court's judgment. *Loumiet v. Loumiet,* 103 S.W.3d 332, 336 (Mo.App. W.D. 2003). Deference is given to the trial court's witness credibility determinations; the trial court is free to believe or disbelieve, all, part, or none of any witness' testimony. *In re Marriage of Wood,* 262 S.W.3d 267, 270 (Mo.App. S.D.2008). "We will not reweigh the evidence, even if the evidence could have supported another conclusion." *Ethridge v. Ethridge,* 239 S.W.3d 676, 681 (Mo.App. E.D.2007).

## Statutory Framework

When awarding child custody, the court must determine the best interests of the child. § 452.375.2. In making its determination of best interest, section 452.375 requires the court consider the public policy stated in section 452.375.4 and the eight statutory factors included in section 452.375.2. *Speer v. Colon,* 155 S.W.3d 60, 61 (Mo. banc 2005); *Belcher v. Belcher,* 106 S.W.3d 601, 603 (Mo.App. W.D.2003). Section 452.375.6 further requires that when child custody is contested, written findings be made in the judgment based on public policy and the eight factors enumerated in section 452.375.2.[4]

Section 452.375.4 provides:

The general assembly finds and declares that it is the public policy of this state that frequent, continuing and meaningful contact with both parents after the

---

4. The eight factors in section 452.375.2(1)–(8) are:

(1) The wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties;

(2) The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;

(3) The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;

(4) Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent;

(5) The child's adjustment to the child's home, school, and community;

(6) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved. If the court finds that a pattern of domestic violence has occurred, and, if the court also finds that awarding custody to the abusive parent is in the best interest of the child, then the court shall enter written findings of fact and conclusions of law. Custody and visitation rights shall be ordered in a manner that best protects the child and any other child or children for whom the parent has custodial or visitation rights, and the parent or other family or household member who is the victim of domestic violence from any further harm;

(7) The intention of either parent to relocate the principal residence of the child; and

(8) The wishes of a child as to the child's custodian.

parents have separated or dissolved their marriage is in the best interest of the child.... In order to effectuate these policies, the court shall determine the custody arrangement which will best assure both parents ... have frequent, continuing and meaningful contact with their children so long as it is in the best interests of the child.

Under section 452.375.1(3):

"Joint physical custody" means an order awarding each of the parents significant, *but not necessarily equal,* periods of time during which a child resides with or is under the care and supervision of each of the parents. Joint physical custody shall be shared by the parents in such a way as to assure the child of frequent, continuing and meaningful contact with both parents[.] (Emphasis added).

### Analysis

■ Mother does not contest the joint physical custody of Child, but contends the limited nature of her award of physical custody is not supported by substantial evidence and is not in the best interests of Child. We disagree.

Here, the trial court considered each of the eight factors and made specific written findings for each. The trial court concluded Child's best interest would be served with the court's parenting plan. The trial court, among other things, considered Mother's irrational behavior; resistance in allowing Father to have contact with Child without a court order; history of causing "public debacles" at the exchange of Child; need to seek mental health counseling; failure to properly clothe Child for weather conditions; and generalized paranoia. In particular, the trial court relied on factors (1), (2), (4) and (6) of section 452.375.2, which all weighed in Father's favor. After careful review of the evidence, we conclude there is substantial evidence in the record to support each of the trial court's findings.

Mother concedes that the trial court is entitled to determine the credibility of the evidence, but argues the above-cited evidence has "little significant impact on the welfare or best interests of Child" and "[a]lthough [Mother] may have yelled at [Father] or the third parties involved with custody exchanges, there was no showing that [Child] was adversely affected by this behavior, or that he was even exposed to it." Essentially, Mother is asking this Court to ignore these incidents because she claims there was no proof Child was adversely affected by her behavior.

■ However, in ascertaining the best interests of a child, a trial court may consider the conduct of the parties. *R.J.A. v. G.M.A.*, 969 S.W.2d 241, 244 (Mo.App. S.D. 1998). Significantly, "[c]onsideration of a parent's behavior is not limited to that which has in fact detrimentally affected the child." *Id.* In fact, consideration must be given to what conduct a parent may inspire by example, or what conduct of a child a parent may foster by condonation. *Id.* Past and present actions may be reliable guides to the priorities of a parent. *Id.* Although proof of the detrimental impact of a parent's behavior is not required, in this case, it is hard to believe Mother's behavior, including screaming and grabbing Child, did not frighten Child. Father and Ms. Geif testified Child did not want to go to Mother during exchanges and Mother would forcefully grab Child.

Furthermore, there is little question that Mother continued to be an impediment to Father receiving frequent, continuing, and meaningful contact with Child due to her extreme conduct at exchanges. Factor (4) specifically directs the trial court to consider "which parent is more likely to allow the child to have frequent,

continuing and meaningful contact with the other parent." The General Assembly carefully enumerated factors to ensure the trial court considered appropriate evidence that is indicative of the child's best interests. Thus, Mother's behaviors, including her inappropriate conduct at custody exchanges, were important considerations to Child's best-interest determination, and were appropriately considered in accordance with section 452.375.[5] In finding factor (4) weighed in favor of Father, the trial court observed, "Mother has been an impediment to Father's contact with [Child] from the time of the separation. While Mother gives lip service to co-parenting, she exhibits none of the behaviors necessary for a successful co-parenting arrangement."

■ Importantly, section 452.375.4 also emphasizes Missouri's public policy declaring children should have frequent, continuing and meaningful contact with both parents, except when the court specifically finds otherwise. The behavior Mother points to as having little impact on Child's best interests, (irrational behavior, resistance in allowing Father to have contact with Child without a court order, causing public debacles at the exchange of Child, need to seek mental health counseling, failure to properly clothe Child for weather conditions, and generalized paranoia) has been a direct barrier to ensuring continued contact with Father. "A parent's history of denying the other parent meaningful contact with a child may be considered in determining the child's physical placement." *Rinehart v. Rinehart,* 877 S.W.2d 205, 208–09 (Mo.App. S.D.1994).

Mother additionally claims the physical custody award of Child "is a long way from an equal division between the parents" and is so limited as to not meet the definition of joint physical custody. However, section 452.375.1(3) does not require *equal* periods of time between parents. More limited physical custody arrangements than the trial court's parenting plan in this case have been held to constitute "joint-physical custody." *See, e.g., Nix v. Nix,* 862 S.W.2d 948, 951 (Mo.App. S.D.1993). Mother is misguided in citing *Davis v. Schmidt* in support of this contention as Mother's custody award provides for more than double the parenting time with Child than the parenting plan in *Davis.* 210 S.W.3d 494, 506 (Mo.App. W.D.2007) (Father was awarded a mere 26 hours of parenting time on an every other weekend basis, effectively allotting him a mere nine percent of the total parenting time). Although Mother's parenting time is less than Father's, she has been allotted significant parenting time that will provide frequent, continuing and meaningful contact with Child.

Mother finally contends that because the GAL testified Child should spend a significant amount of time with each parent, and Father agreed Child should spend time

---

5. We also note Mother makes accusations that Commissioner Chrisman held "hostilities towards [Mother] beyond finding her testimony was largely incredible" because Mother was ordered to deliver a scripted speech during custody exchanges ("Thank you. Nice seeing you." and "We had a good time. Thanks, see you next week.") while Father was not and because she stated Father could not be blamed for secretly recording custody exchanges due to Mother's propensity for calling law enforcement while failing to note Father's call to law enforcement on November 11, 2009. However, we find requiring Mother to deliver a scripted speech was warranted considering the ample evidence of Mother's persistent problematic behavior at custody exchanges. Additionally, her comment that Father's secret recording was not irrational is not a reflection of her hostilities toward Mother, but rather reflects Mother's continued *attempts to place Father in violation of the Full Order of Protection.*

with Mother, that this custody award was not supported by substantial evidence and the allocation of time was not in the Child's best interest. Again, Mother is asking this Court to substitute our judgment for that of the trial court. We decline to do so since credible evidence supports the trial court's findings. We additionally note the trial court's parenting plan is in accordance with the GAL's observations and Father's testimony as Mother was in fact awarded a significant amount of time with Child.

Accordingly, there is no showing the trial court's decision was manifestly erroneous or that Child's welfare compelled a different result. We conclude there is substantial evidence to support the trial court's parenting plan as being in the best interest of Child. Mother's point is denied.

The judgment of the trial court is affirmed.

RAHMEYER, P.J., and BATES, J., Concur.