In re the MARRIAGE OF Terrance
LeRoy HORINEK and Catherine
Marie Horinek.

Terrance LeRoy Horinek, Respondent,

and

Catherine Marie Horinek, Appellant,

and

Douglas J. and Deanna L. Horinek,
Respondents.

No. 23205.

Missouri Court of Appeals,
Southern District,
Division Two.

Feb. 28, 2001.

Motion for Rehearing or Transfer
Denied March 21, 2001.

Application to Transfer Denied
April 24, 2001.

Vance E. Salter, Coll, Davidson, Smith, Salter & Barkett, P.A., and Deanna K. Scott, Twibell, Johnson, Johnson & Scott, Miami, FL., Attorneys for Appellant.

Gary W. Lynch, Douglas, Lynch, Haun & Kirksey P.C., Bolivar, Attorney for Respondents.

BARNEY, C.J.

Catherine Marie Horinek ("Mother") appeals from a Judgment of Dissolution and Custody of the Circuit Court of Dallas County—filed August 5, 1999—dissolving her marriage to Terrance LeRoy Horinek ("Father") and awarding sole legal and physical custody of Mother's and Father's child, Katherine Christina Horinek ("K.C."), born December 27, 1997, to the paternal grandparents Douglas J. and Deanna L. Horinek ("Paternal Grandfather" and "Paternal Grandmother" respectively; "Intervenors" jointly).[1]

Mother raises two points of trial court error on appeal: 1) that the trial court erred in determining that she was "unfit, unsuitable and unable" to be K.C.'s custodian, because the trial court failed to

---

1. Father initially filed a petition for dissolution on May 13, 1998, and Catherine filed a cross-petition on June 12, 1998. Intervenors filed their motion to intervene on July 30, 1998, seeking custody of K.C. Father then withdrew his petition on August 27, 1998.

"consider statutory factors and enter written findings as required by law," and because the determination was against the weight of the evidence; and 2) that the trial court erred in adopting Intervenor's parenting plan because it deprived Mother of "frequent, continuing, and meaningful contact" with K.C., and such a plan was not in K.C.'s best interest.[2]

The record shows that Mother and Father met while serving in the United States Navy and stationed in Illinois. Mother had joined the Navy in 1996 after having graduated from High School in Ft. Lauderdale, Florida. She had lived in Florida most of her life. Father joined the Navy in March of 1996 as part of a plea bargain involving a criminal charge in Atwood, Kansas, where his family was living at the time. He had dropped out of high school and was arrested a few days later for taking "indecent liberties" with a fourteen-year-old girl and had spent a couple of months in jail before joining the Navy.

Father and Mother were married in January of 1997 and both continued serving in the Navy until March of 1997. As best we can glean from the record, Father received either a dishonorable or an "other than honorable" discharge from the Navy on March 10, 1997, due to excessive alcohol use and a pattern of unauthorized absences. Mother, on the other hand, faked mental illness and lied about a suicide attempt in order to obtain an "entry level separation" on the basis of a personality disorder on March 25, 1997.

Mother and Father then moved to Missouri and lived briefly with Intervenors in Buffalo, Missouri.[3] Mother and Father moved out of Intervenors' home after Father fought with his parents over a letter Paternal Grandmother found which revealed that Father was writing to another woman. Mother and Father then moved briefly to Woods Motor Lodge, followed two weeks later by a move to a house trailer 10 to 15 miles outside of Buffalo, Missouri. Mother at some point found out that she was pregnant. Her mother ("Maternal Grandmother") came to Missouri to visit after hearing the news. Shortly thereafter Mother returned to Florida with Maternal Grandmother.[4] In Florida,

---

2. Intervenors have filed a motion, which we have taken with the case, urging us to dismiss this appeal due to violations of Rule 84.04, Missouri Court Rules (2000). Intervenors assert, among other things, that Mother's statement of facts is biased and argumentative, that her points relied on "do not provide any evidentiary basis to support the ruling," and that her "first point does not state why the trial court ruling was erroneous." While Catherine's brief is not a model to be followed by future appellate advocates in Missouri, it is clear it sufficiently apprised Intervenors of the arguments being advanced. Although we might be inclined to rule as Intervenors have requested in some situations, it has generally been a policy of the appellate courts to refrain from dismissing cases concerning the custody of children on the basis of technical violations, whenever reasonably possible. *See Webber v. Johnson,* 956 S.W.2d 952, 954 (Mo. App.1997); *Myers v. Myers,* 480 S.W.2d 74, 76 (Mo.App.1972). Intervenors' motion to dismiss is denied.

3. Intervenors had previously moved to Buffalo from Kansas in 1996. Paternal Grandmother testified that they moved because Paternal Grandfather was transferred. Mother testified that Intervenors had moved because of Father's legal troubles.

4. The testimonies as to why Mother left for Florida vary widely and are split down family lines. According to Mother and Maternal Grandmother, Mother left because she was living in a bad environment and because Father had shoved her during an argument in front of Maternal Grandmother. Maternal Grandmother testified that she had confronted Paternal Grandmother about Father's violence and that Paternal Grandmother didn't want to talk about it, stating that Mother and Father were adults and it wasn't any of her

Mother obtained a job, registered for school, and started attending counseling for battered women.

Three weeks later, Mother returned to Missouri. She and Father moved back into Intervenors' home for a brief period of time, then moved in with a friend for a couple of weeks, and finally returned to Intervenors' home. Soon thereafter, Father once more was forced to move out of his parents' home when he threatened to slit his younger brother's throat during an argument. According to Mother, Father also threatened to put a bullet in her head if that was what it took to keep her from taking the unborn baby away from him. Mother stayed with Intervenors until K.C. was born on December 27, 1997. After K.C.'s birth, Mother and Father moved back into Woods Motor Lodge. Father left three weeks later after the coupled argued. Intervenors then helped Mother move into an apartment of her own in early February of 1998 and Mother obtained a job working at the Dallas County Care Center. Before long, Father moved into the new apartment with Mother.

On March 17, 1998, the couple had a physical altercation which resulted in a window being broken. The police were called. There were allegations of physical assault leveled by both parties. Father left, taking K.C. with him to Intervenors' home.

Following this altercation, it appears that Mother and Father again reconciled to some extent and resumed living together with K.C., possibly as soon as the next day.[5] However, Mother testified that it seemed to her that "March 17th was a dead end to me having control of my daughter," and that from that point on, K.C. began spending more and more time in the home of Intervenors.

On May 7, 1998, following another altercation between Mother and Father, Father obtained an *ex parte* order of protection against Mother which, *inter alia*, forbade her from entering or staying at the apartment that she had rented and where they both were residing. Mother then moved back into Woods Motor Lodge. Maternal Grandmother flew to Missouri the next day to be with Mother. As best this Court can discern, two days later Mother and Maternal Grandmother visited an attorney. There was testimony that the attorney informed them there was no legal order preventing Mother from having custody of her daughter. On this same day, Father signed a power of attorney authorizing Intervenors to "make decisions" concerning K.C. That night, Intervenors brought K.C. for a visit with Mother and Maternal Grandmother. Mother and Maternal Grandmother took custody of K.C. and called the police, hoping to maintain control of the little girl. Although there is some disagreement on the actual events, it appears to this Court that the police in some way effectuated a transfer of the child back to Intervenors.[6]

Maternal Grandmother returned to Florida; Mother followed three weeks la-

business. According to Father and Intervenors, Mother told them she only went back to Florida for a visit. However, Father and Intervenors were concerned that Mother might remain in Florida.

5. Mother initially testified that Father returned to the apartment the next day but that K.C. was kept by Paternal Grandmother and did not return. Mother later recanted her testimony and admitted that there were in-

deed times after March 17 when K.C. spent the night in the apartment with her and Father.

6. Intervenors had evidently brought along a copy of the power of attorney and a copy of the petition Father executed, requesting an *ex parte* order against Mother. In the petition, Father requested custody; however, the court made no award of custody in the *ex parte* order that was granted.

ter, without K.C., and took up residence with Maternal Grandmother. Mother testified that the reason she left Buffalo was because she had no job, no car, and no prospects in Buffalo. In Florida, Mother obtained a job with Service Merchandise in June of 1998, and started working toward an associate degree soon after. After Mother filed her cross-petition for divorce June 12, 1998, she filed a motion for temporary child custody or visitation on June 24, 1998. This motion was never ruled on during the course of the litigation. Father had moved back in with Intervenors after he had filed his petition for dissolution but was kicked out a couple of months later after they found what they thought was a bag of marijuana while washing his clothes. In December of 1998 Father was arrested on another criminal charge. He was incarcerated at the time of trial and is presently in prison.

■ In reviewing Mother's first point on appeal, we need only address Mother's contention that the trial court's judgment awarding primary physical custody to Intervenors was against the weight of the evidence.[7]

■ "As to an award of child custody, we will affirm the decision of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Flathers v. Flathers,* 948 S.W.2d 463, 465 (Mo.App.1997); *see Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976).

A judgment will be set aside as being "against the weight of the evidence" when the appellate court has a "firm belief that the judgment is wrong." Weight of the evidence refers to weight in probative value not quantity or the amount of evidence. The weight of evidence is not determined by mathematics, but on its effect in inducing belief. *Flathers,* 948 S.W.2d at 465(quoting *Silver Dollar City, Inc. v. Kitsmiller Const. Co., Inc.,* 931 S.W.2d 909, 918 n. 18 (Mo.App. 1996)). "The trial court has broad discretion in child custody matters, and we will affirm its decision unless we are firmly convinced that the welfare and best interests of the children requires otherwise." *Id.; see also Young v. Young,* 14 S.W.3d 261, 264 (Mo.App.2000). "We presume parental custody is in a minor child's best interests." *Young,* 14 S.W.3d at 264. "To rebut this presumption, the third party seeking custody must carry the burden of showing either that each parent is unfit, unsuitable, or unable to have custody or that the welfare of the child requires third-party custody." *Id.; see Flathers,* 948 S.W.2d at 466.

■ "The public policy of Missouri is to 'assure children frequent and meaningful contact with both parents after the parents have separated or dissolved their marriage....'" *R.J.A. v. G.M.A.,* 969 S.W.2d 241, 246 (Mo.App.1998); *see* § 452.375.4. Under section 452.375.2 the trial court is to determine who shall be awarded custody of a child in accordance with the best interests of that child. In making this determi-

---

7. We do not discuss the remaining contention in Mother's Point One, alleging trial court error in failing to make the written findings required by section 452.375.6, RSMo Cum. Supp. 1998. In its initial review, this Court agreed with Mother's contention, held this appeal in abeyance, and ordered the trial court to provide the required findings to this Court. The trial court, commendably, com-

plied with this order. The trial court's findings were incorporated into the record, and the cause was restored to the active docket. Mother's second point, i.e., that the trial court ordered visitation was insufficient to allow frequent, continuing and meaningful contact with K.C., is rendered moot by our decision. All statutory references are to RSMo Cum. Supp. 1998, unless otherwise set out.

nation, the court is to consider "all relevant factors," including, but not limited too, the following six:

(1) The wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties;

(2) The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;

(3) The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;

(4) Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent;

(5) The child's adjustment to the child's home, school, and community;

(6) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved. If the court finds that a pattern of domestic violence has occurred, and, if the court also finds that awarding custody to the abusive parent is in the best interest of the child, then the court shall enter written findings of fact and conclusions of law. Custody and visitation rights shall be ordered in a manner that best protects the child and the parent or other family or household member who is the victim of domestic violence from any further harm;

(7) The intention of either parent to relocate the principal residence of the child; and

(8) The wishes of a child as to the child's custodian.

§ 452.375.2.

Section 452.375.5 controls the award of custody to third parties.

This subsection reads, in relevant part:

5. Prior to awarding the appropriate custody arrangement in the best interest of the child, the court shall consider each of the following as follows:

(1) Joint physical and joint legal custody to both parents, which shall not be denied solely for the reason that one parent opposes a joint physical and joint legal custody award . . . ;

(2) Joint physical custody with one party granted sole legal custody . . . ;

(3) Joint legal custody with one party granted sole physical custody;

(4) Sole custody to either parent; or

(5) Third Party custody or visitation:

(a) When the court finds that each parent is unfit, unsuitable, or unable to be a custodian, or the welfare of the child requires, and it is in the best interests of the child, then custody . . . may be awarded to any other person or persons deemed by the court to be suitable and able to provide an adequate and stable environment for the child . . . .

. . . .

§ 452.375.5.

As previously set out, "[p]ursuant to this subsection, a third party must show that 'each parent is unfit, unsuitable, or unable to be a custodian, *or* the welfare of the child requires' it, rendering it in the best interests of the child to award his or her custody to the third party." *Flathers,* 948 S.W.2d at 466 (quoting § 452.375.5); *see Jones v. Jones,* 10 S.W.3d 528, 535 (Mo. App.1999). Furthermore, if the presumption in favor of parental custody is not rebutted, the question of the child's best interests is never reached. *Jones,* 10 S.W.3d at 535–36.

Here, the trial court found that the pertinent factors under section 452.375.2 favored granting custody to Intervenors.

The trial court specifically found that: (a) Father had no desire for custody; (b) Mother requested custody and proposed "removing the child to the state of Florida and leaving the child in the care of [Maternal Grandmother] and maternal great-grandmother the majority of the time while [Mother] is in school and working"; (c) that Father and Mother had "both demonstrated by their behavior since the birth of the child that neither of them have the maturity and responsibility to perform those functions"; (d) "that such interrelationships as the child may have at this tender age are with the family of [Intervenors]"; (e) that Mother wanted "to relocate the child to Florida, thus effectively terminating all meaningful contact with [Father] and his family"; (f) that "[t]he child's primary home during her life thus far has been that of [Intervenors] and the evidence would indicate she has adjusted well to the home"; (g) Mother received a discharge from the Navy based on a personality disorder, frequently lied to health care providers, and may or may not have attempted suicide depending on which of her stories can be believed; (h) that parents have a history of domestic violence and abuse as between the two of them *"but there is no substantial evidence this abuse ever involved [K.C.]"* (emphasis added).

As previously recited, the trial court ultimately found that "both [F]ather and [M]other [were] unfit, unable, and unsuitable to have legal or physical custody ... [and] that the welfare of the child in this case requires that her custody be awarded to persons other than [Father] or [Mother]." [8]

This case once again demonstrates the extreme difficulty the courts have in dealing with child custody matters. *Flathers,* 948 S.W.2d at 471. We reiterate that a natural parent is not to be denied custody of his or her minor child, unless the third party seeking custody first carries its burden of showing that the parent is unfit, unsuitable, or unable to have custody or that the welfare of the child otherwise requires it. *Id.* at 466. The parental presumption has long been recognized in case law. *Id.* Having reviewed the record and the trial court's statutory findings, this Court is firmly convinced that Intervenors have not carried their burden of rebutting the presumption that Mother is a fit, suitable, and able custodian to K.C. and that K.C.'s welfare is best served by awarding custody to them. *See id.* We are firmly convinced that the trial court's award of the legal custody and primary physical custody of K.C. to Intervenors is an abuse of discretion; was against the weight of the evidence and was based on an errone-

**8.** The court also found that "[a]fter consideration of all relevant factors, including those set forth in § 452.375 RSMo., the provisions in the Parenting Plan related to custody, visitation and residential time are in the best interest of [K.C.]" and incorporated a parenting plan that awarded sole physical and legal custody to Intervenors and awarded visitation to Mother one week during the months of September and March of each year; two weeks during the summer, every Mother's day, approximately three other holidays a year, and "reasonable visitation at any time she is in the state of Missouri." The holidays and the weeks of summer visitation, during which Mother has custody of K.C., rotate de-

pending on the year. According to our calculation, Mother is authorized about four to five weeks of visitation a year, for no more than one week at a time. Father is awarded "reasonable weekend visitations," to be worked out with Intervenors; two weeks of visitation during the summer, Father's day each year, and approximately three other holidays a year. The trial court further ordered that the place of exchange of the custody of K.C. would be "at the residence of [Intervenors] and [K.C.]" and that "[e]ach party shall provide their own transportation to the place of exchange." Lastly, each parent is to pay Intervenors $150.00 a month as child support.

ous application of the factors specified in section 452.375.2, .5 and .6. *See id.* at 465; *Rinehart v. Rinehart,* 877 S.W.2d 205, 209 (Mo.App.1994).

It is clear that Mother has made many mistakes in her young life. We do not ignore the evidence admitted into the record detailing Mother's past failures as a parent.[9] Mother admitted to smoking marijuana three times and "snorting" methamphetamine twice in April of 1998 and to drinking beer while pregnant, although she claimed to never have used drugs prior to coming to Missouri.

Mother's mistakes, however, appear to be tied directly to her relationship with Father. Father and Mother had numerous arguments and at least two physical altercations. Father clearly had problems with violence, as evidenced by his threats to Mother and his brother, and his arrest for unlawful use of a weapon when he was caught carrying a steak knife tucked in his belt. Father is now in prison.

Following the couple's March 17, 1998, altercation, a Buffalo police officer wrote in a personal note attached to his incident report: "[p]lease get this to Family Services. I believe [Father] is abusive but [Mother] did not make any reports until she got mad that I was letting [Father] take the child to [Paternal Grandmother's].... These people are making bad decisions and need help."

The evidence shows that Father was much more heavily involved with illegal drugs than was Mother. Testimony was presented that Father used illegal drugs beginning in high school.[10] Evidence was also presented that Father was dealing in narcotics. Mother testified that Father sold drugs from the apartment and kept scales for weighing the drugs and sometimes even hid the drugs under the mattress of K.C.'s crib. Paternal Grandmother reported to the Division of Family Services on March 24, 1998, that "Father was high daily."

▮▮▮▮▮ Nevertheless, Father's and Mother's relationship is now over. The couple's marriage is dissolved. Mother lives in Florida where she resides with Maternal Grandmother, works, and attends school. While "[b]oth past and present actions may be reliable guides to the priorities of a parent," *R.J.A.,* 969 S.W.2d at 244, "[a] parent's right to custody of his or her minor child is determined by existing conditions-past conditions are material only to the extent that they clarify and cast light on present conditions." *Flathers,* 948 S.W.2d at 470. "The law is clear that custody proceedings may not be used to reward or punish a parent." *Johnston v. Johnston,* 573 S.W.2d 406, 412 (Mo.App. 1978).

Here, the evidence shows that Mother is now living in a stable and peaceful home with Maternal Grandmother. This is evi-

---

**9.** Much of the Intervenors' evidence was in the form of exhaustive testimony from Paternal Grandmother. The bulk of her testimony was buttressed with the aid of a daily log that she had kept in a three ring binder detailing events relating to K.C., Mother and Father. Paternal Grandmother, who had ten years of experience working as a secretary in various law firms in Kansas and Missouri, started the log the same day K.C. was born. At trial it consisted of about two hundred single spaced, typed pages. Paternal Grandmother's purported reason she commenced the log was

because she was concerned about Father's treatment of Mother, although there was ample evidence presented showing that Paternal Grandmother was well aware of Father's propensity towards violence long before K.C.'s birth.

**10.** Mother testified that Father had told her he had used drugs and Paternal Grandmother testified that she had heard that he had used drugs.

denced by both Mother's testimony and Maternal Grandmother's testimony. Photographs of Mother's new home in Florida show a clean and adequately spacious living arrangement. Mother is now pursuing an associate degree and is gainfully employed, with the prospect of obtaining better employment upon completion of her degree. This is evidenced by proof of grades in school and by pay stubs. The evidence also reveals that Mother has the support of her own family to assist her with child care and that she passed two surprise drug screenings given her in Florida during the course of this case.[11]

We are aware that Paternal Grandmother testified that she had come over to check on K.C. a number of times and found K.C. crying with her diaper soiled and/or wet while Mother and Father were asleep. Paternal Grandmother also related that she had found pieces of glass in the carpet of the house resulting from Mother not cleaning up adequately after one of the couple's fights. She further testified that at one time both Mother and Father had head lice. Intervenors introduced evidence that K.C. has suffered two severe diaper rashes and related that Mother and Father had scorched a couch and a towel by having a heater turned up too high after breaking the window.

The record shows that the Division of Family Services ("DFS") became involved with the family at about this time. A social worker made several home visits, often unannounced. Yet, DFS social workers, presumably objective observers, never found anything to substantiate any reported allegations of neglect or abuse.

As best we discern from the record, Paternal Grandmother had made at least two reports of neglect/abuse of K.C. to

authorities. These reports were investigated by DFS. As reflected in the "chronological narrative" prepared by DFS, on February 6, 1998, Paternal Grandmother reported that she had been to Father's and Mother's residence and described Father as a "frequent drug user." Paternal Grandmother related that "the baby [K.C.] has been dirty with a wet and soiled diaper that obviously had not been changed for a long time." She expressed the concern that Father and Mother were "using drugs" and were "not taking proper care of the baby." A DFS social worker and a Buffalo city policeman investigated the matter by making an unannounced visit to Mother and Father's place of residence. The DFS "chronological narrative" recited that the "parents let me hold the baby" and that the "baby had on clean clothes and a clean diaper." The baby was described as "alert" and "her eyes were open." The "bedding looked okay . . . and the family is on WIC. . . ." Based on their investigation, the DFS worker found that the reports of neglect/abuse were "unsubstantiated."

According to the record, Paternal Grandmother also made another report to DFS on March 24, 1998. She related that Mother and Father used drugs and that K.C. "has bruises on her arms and buttocks" and that she was "slammed down" during a fight between Mother and Father the week before; that Mother worked 3 p.m. until midnight and that K.C. had been without supervision at times. Paternal Grandmother also alleged that Mother and Father "spilled medication" on K.C., and that K.C. was "covered with ant bites" and that in the past K.C. had "had a rash because she is not changed for days." DFS investigated these allegations by

---

**11.** As Intervenors point out, one of the tests suggested a large ingestion of fluids prior to the specimen being collected. But no evidence was presented that this result was proof of foul play on the part of Mother or caused the test to be invalid.

making a home visit the day of the report and found them to be unsubstantiated. In its "chronological narrative" DFS set out that K.C. was:

asleep on the parents bed, which is a mattress laying in the bedroom floor by the crib. She was very clean, appeared healthy, no rash or bruises. No evidence of bites of any kind. . . . [S]he appeared to be very alert and had good interaction with [Father]. [Father] stated that he has been having problems with [Paternal Grandmother] and he believes she wants custody of his daughter.

Darren Vess, a social services worker with Dallas County Family Services in Buffalo testified at trial that every time he visited the parent's home, including visits in March of 1998 and during April of 1998, K.C. always looked "O.K." when he was there; that "it seemed like they always were trying to take good care of the baby"; and that "[t]he problems . . . that they had that [he] saw was—it was just—it was a problem with each other in just getting along . . . there was a lot of discord there. . . ." The foregoing reports, then, comport with the trial court's findings of "no substantial evidence of abuse involving K.C."

 We also observe that the guardian ad litem was present throughout the trial. The record shows that prior to and during the trial she had visited with Mother, Father, Intervenors, and Maternal Grandmother and had attended depositions. She cross-examined the principles during the course of the trial. She cross-examined Intervenors' expert witness, and in her fee schedule submitted a bill for 48 hours and 25 minutes. The guardian ad litem recommended, *inter alia*, that:

[Mother] be awarded the primary physical and legal custody of K.C. and that Intervenors be awarded substantial summer and holiday visitation. I would also recommend a transition period of visitation for the next year to effect a transition of the child from Intervenors' residence to [Mother's] residence.

I would also recommend a schedule of visitation be ordered with respect to [Father], to be exercised by him upon release from the DOC.

While the trial court "is not bound by the opinion or recommendation of the guardian ad litem," *Francka v. Francka*, 951 S.W.2d 685, 692 (Mo.App.1997), clearly her recommendation carries some weight.

We note that in its findings the trial court was critical of Mother's decision to return to Florida, the state she lived in from age five until she graduated from high school. The trial court found that Mother's custody plan "involves removing the child to the state of Florida and leaving the child in the care of [Maternal Grandmother] and maternal great-grandmother the majority of the time while [Mother] is in school and working" and that such a move would "effectively terminat[e] all meaningful contact with [Father] and his family."

We find nothing unusual in the fact that a twenty-year old woman in Mother's position would want to be near her own family with whom she had lived with just a year and a half previously. She was, after all, virtually jobless and experiencing the travails of a dissolution of her marriage from a man 1) who provided inadequate support for his child, 2) with whom she has had physical altercations, and 3) who had obtained an order of protection against her. *See Fuchs v. Fuchs*, 887 S.W.2d 414, 417 (Mo.App.1994) ("we do not consider it to be contrary to [minor's] best interests for Wife and [minor] to leave the geographical area . . . in an effort to establish a new life in an area close to her family, who are willing to provide support and help").

As to the trial court's findings that Mother will be leaving the child in the care of her own mother and grandmother, it is common knowledge that child care is an unavoidable necessity for a single parent. Mother is not independently wealthy and must necessarily rely on the assistance of other persons—in many cases family members.[12]

Additionally, we observe that this is not a situation where Father's family has extensive ties to—or extended family in—Missouri. There was ample testimony that Intervenors spent many holidays in Kansas, where Intervenors and Father had lived until Father joined the Navy in 1996. As for a relocation by Mother "effectively terminating all meaningful contact with Father and his family," we disagree. First, as previously set out, Father is incarcerated. He did not seek custody of K.C. in the dissolution of marriage proceedings. At present Father can have but little, meaningful contact with K.C., regardless of whether Mother resides in Missouri or Florida. Second, while it is in K.C.'s best interests to have continuous interrelationship with both parents and their families, this does not mean that nonresidence is an insurmountable obstacle in achieving that purpose, particularly considering the mobility of our society in this day and age. *See Fuchs,* 887 S.W.2d at 417.

■ Finally, the trial court found that "[K.C.'s] primary home during her life thus far has been that of [Intervenors] and the evidence would indicate that she has adjusted well to the home" and that "[s]ince birth, the closest thing to a parent this child has had has been [Paternal Grandmother]. The child has spent more time with [Paternal Grandmother] than with anyone else due to the parents['] ina-

bility and unwillingness to care for the child themselves." We observe that K.C. was four and a half months old when Father filed for dissolution of the marriage. Until that time, she had spent more time with her parents than with Intervenors. Mother filed a motion for temporary child custody/visitation a little over a month later, when K.C. was six months old. However, as best we discern, the trial court failed to address this motion. Save for about a three week period of time when the child was in Florida with Mother, the practical effect of the trial court's failure to rule on Mother's motion was that K.C. continued in the sole custody of Intervenors during the course of the litigation. Mother had to approach Paternal Grandmother on an *ad hoc* basis every time she wanted to interact with her own child. This, in turn, reinforced the notion that Intervenors' home was K.C.'s "primary home." While we observe that "a significant bonding familial custody relationship with third parties can constitute a special or extraordinary reason or circumstance rendering it in a child's best interests to award third-party custody," *Flathers,* 948 S.W.2d at 470, not every third-party custodial relationship will automatically rebut the parental presumption rendering it in the best interests of the child that third-party custody be awarded. "Each case must turn on its own facts." *Id.* Here, even Intervenors' expert witness testified that it was "impossible" to say that K.C. would suffer any damage if relocated from Intervenors' home to Mother's home "[w]ithout doing a fairly thorough assessment." This assessment was never performed. Furthermore, Mother has taken significant steps to change her lifestyle. As previously recited, the record shows

---

**12.** We note that Intervenors both work. K.C. attended an all-day care facility. Intervenors' high school age children, who have helped in

taking care of K.C., will likely be moving out of Intervenors home in a few years.

that she now has separated from Father and eschews her brief use of illegal drugs. She is enrolled in school, has obtained gainful employment, is living with Maternal Grandmother in a suitable home, and apparently has a genuine interest in caring for and raising K.C. *See Id.* at 471.

Therefore, that portion of the judgment of the trial court awarding legal custody and primary physical custody of K.C. to Intervenors, together with an attached parenting plan, is reversed and the case is remanded with directions that the trial court enter judgment awarding legal custody and primary physical custody of K.C. to Mother. Consistent with this opinion, the trial court is further directed to award child support in such amount as it determines reasonable in accordance with section 452.340, RSMo Cum.Supp. 1999 and Rule 88.01, Missouri Court Rules (2000), and is directed to create a parenting plan, pursuant to section 452.310.7, RSMo Cum. Supp. 1999, encompassing visitation rights for Terrance LeRoy Horinek, together with a plan for Intervenors' visitation, pursuant to section 452.402, RSMo Cum.Supp. 1999. Whether it is necessary to have further evidentiary hearing is left to the sound discretion of the trial court. In all other respects the judgment is affirmed.

PREWITT and GARRISON, JJ., concur.