# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Ikerman*, 2012 IL App (5th) 110299

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARK A. IKERMAN, Defendant-Appellant. |
| District & No. | Fifth District<br>Docket No. 5-11-0299 |
| Rule 23 Order filed<br>Motion to publish granted | July 9, 2012<br><br>August 1, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court did not abuse its discretion in sentencing defendant to 10 years in prison on two counts of aggravated driving while under the influence of alcohol that resulted in the death of a man and his infant son and denying defendant's request for probation, since the evidence that the adult decedent was out late at night with his son while he was intoxicated and that he parked his disabled vehicle on a road with no illumination shortly before defendant crashed into his vehicle did not constitute extraordinary circumstances warranting probation. |
| Decision Under Review | Appeal from the Circuit Court of Madison County, No. 08-CF-2607; the Hon. James Hackett, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Edward W. Unsell, of Law Office of Edward W. Unsell, of East Alton, and Chet Kelly, of Belleville, for appellant. |
| | |
| | Thomas D. Gibbons, State's Attorney, of Edwardsville (Patrick Delfino, Stephen E. Norris, and Sharon Shanahan, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | |
| Panel | JUSTICE WELCH delivered the judgment of the court, with opinion. |
| | Justices Goldenhersh and Wexstten concurred in the judgment and opinion. |

## OPINION

¶ 1     The defendant, Mark Ikerman, was found guilty of two counts of aggravated driving while under the influence (DUI) of alcohol resulting in two deaths (625 ILCS 5/11-501(d)(1)(F) (West 2008)), two counts of failure to report an accident involving two deaths (625 ILCS 5/11-401(b) (West 2008)), and two counts of aggravated driving with a blood-alcohol level of 0.08 or more resulting in two deaths (625 ILCS 5/11-501(d)(1)(F) (West 2008)). During sentencing, the trial court noted that the two convictions for aggravated DUI and two convictions for aggravated driving with a blood-alcohol level of 0.08 or more merged for sentencing purposes. The court further noted that the two convictions for failure to report an accident also merged for sentencing. Thereafter, the court sentenced the defendant to 10 years in prison on the aggravated-DUI convictions and 5 years in prison on the failure-to-report convictions, which was to run consecutively to the aggravated-DUI sentence.

¶ 2     The defendant only challenges his aggravated-DUI convictions and sentence on appeal. Specifically, the defendant argues (1) the State failed to prove beyond a reasonable doubt that he had a blood-alcohol content (BAC) of 0.08 or more, (2) the State failed to prove beyond a reasonable doubt that he was intoxicated at the time of the offense, (3) the State failed to prove beyond a reasonable doubt that he was the proximate cause of the deaths of the victims, Donald Legens, Sr., and Donald Legens, Jr., and (4) the trial court abused its discretion at sentencing by failing to consider the mitigating factors presented by him and by denying his request for probation. For the following reasons, we affirm.

¶ 3     On November 17, 2008, the State charged the defendant by amended information with two counts of aggravated DUI for his involvement in a motor vehicle accident that resulted in two deaths and with two counts of failure to report an accident involving those two deaths. On October 7, 2010, the State also charged the defendant by information with two counts of aggravated driving with a blood-alcohol level of 0.08 or more resulting in two deaths. On

October 18, 2010, the defendant waived his right to a jury trial, and the case proceeded to a bench trial. The evidence adduced at trial established that in the late-night hours of November 13, 2008, Donald Legens, Sr., was traveling in his Kia with his 10-month-old son, Donald Legens, Jr., on Pontoon Road in Granite City. As he was driving, the vehicle ran out of gas, and he parked in the far right lane of the four-lane road.

¶ 4　　Stephanie Barks was driving home from work on November 14, 2008, at approximately 12 a.m., when she approached two vehicles stopped by a train on West Pontoon Road. After the train passed, the vehicle in the left-hand lane crossed the railroad tracks and continued traveling on West Pontoon Road. However, the vehicle in Barks's lane, the right-hand lane, did not move. Therefore, Barks was forced to move into the left lane and pass the stopped vehicle. As she crossed the railroad tracks, she noticed a man walking toward the vehicle carrying a small child and a gas can. She also observed that the vehicle's headlights were on. She continued driving until she was stopped at a stoplight at the next intersection. As she was stopped at the light, she watched the man from her rearview mirror until the light turned green.

¶ 5　　Also on the same night shortly after midnight, Kerri Yount was traveling west on Pontoon Road when she observed a vehicle parked in the same lane that she was driving (the far right lane). She was approximately two car lengths away when she observed the vehicle parked in her lane with no lights. Consequently, she slammed on her brakes and swerved out of the lane to avoid a collision. As she approached the vehicle, she noticed a man standing behind the vehicle carrying something. It appeared the man was getting ready to step off the side of the road. She did not notice another person near the vehicle. She believed that she would have hit the parked car and the man if she had not been paying attention.

¶ 6　　According to Yount, the man had an unusual reaction to almost getting hit. He gave her a "blank stare," as if he did not care that he was almost hit by a vehicle, and then continued "doing what he was doing." She considered stopping to offer assistance but ultimately decided against it because he was a "strange man" and it was dark and after midnight. Instead, she called the police to request an officer be dispatched to assist the man. She noted that the particular stretch of road where the car was parked was not illuminated and was under construction. She was driving slower than the speed limit because it was very dark and she was afraid of hitting something.

¶ 7　　Minutes later, before the police arrived, the defendant was driving home on Pontoon Road following a night of playing pool at Mac and Mick's tavern. He was driving his employer's tow truck. The defendant was traveling in the same lane as the parked Kia and ultimately collided with the vehicle. His tow truck pushed the Kia 364 feet until the vehicles came to rest on a dirt embankment on the north side of the road. The defendant then backed up and left the scene of the crash.

¶ 8　　Amber Pace was driving toward the scene of the accident when she observed a tow truck with no front end and no headlights traveling in the opposite direction. She believed that the tow truck was traveling faster than the speed limit of 30 or 35 miles per hour. Pace observed the tow truck for approximately 30 to 40 seconds and did not observe it swerve. As she crossed the railroad tracks, she noticed a wrecked blue SUV on a dirt embankment to her

right. She then noticed a body lying in the middle of the road. She parked her vehicle in the road, stopped oncoming traffic before the body was hit, and called 9-1-1. Pace described the area as "not brightly lit, but *** not pitch dark." She observed debris scattered over the four lanes of traffic. She did not realize a baby was involved in the accident until she saw the baby being put in the ambulance.

¶ 9 Gary Poss lived on the south side of Pontoon Road, near the area where the crash occurred. That night, he heard a "massive noise," which sounded like an explosion. After hearing the noise of the crash, he walked to the scene and observed a "massive amount" of debris in the street and a lot of smoke. He also observed the taillights of a large vehicle rapidly leaving the scene. He opined that the truck was rapidly leaving the scene because it was "bouncing all over the railroad tracks." He did not see the SUV until the next morning. He testified that many of the streetlights in the area were removed due to the construction of a new overpass. However, some nearby businesses had large parking lot lights that provided the area with some illumination.

¶ 10 Arriving at the scene shortly after the accident, Granite City police officer Eric Bailey observed a body lying in the road and noted the individual was deceased. He also observed debris on the road. He testified that an infant was injured in the vehicle crash, but he did not see the baby until he observed the baby being put in the ambulance.

¶ 11 Michael Mize observed the damaged tow truck sitting in the middle of the road when he was driving on West Pontoon Road on the night of the accident. According to Mize, the tow truck had significant front-end damage and did not have front headlights. He noticed the tow truck because he thought it peculiar that the truck would be at the accident scene before any emergency vehicles. He observed the truck leave the scene and decided to follow it because it was obvious that a car accident had occurred. As he turned around to follow the truck, he noticed the SUV on the embankment. He followed the truck for approximately six or seven miles until it turned into a driveway to a trailer court. Mize then went to the Pontoon Beach police department to report the accident. He gave the officers at the police department the truck's license plate number and informed them that he believed the truck had been involved in a hit-and-run accident.

¶ 12 Sharon Hildreth received a phone call from the defendant at approximately 1 a.m. on November 14, 2008. The defendant told her that he had been in a vehicle accident, but he did not know what he hit because he had blacked out. He said that the whole front of his truck was damaged, and he left the accident scene because he was drunk. She estimated that the conversation lasted 30 to 45 minutes. While on the phone with the defendant, she heard police officers knocking on his door for approximately 15 to 20 minutes. She knew the knocking was from police officers because the defendant told her. Several times during the phone conversation she advised the defendant to open the door and talk to the officers; however, he refused because he was drunk and scared. She characterized the defendant's speech as slurred and said he was "all over the place." However, the defendant's speech was not so slurred that she was unable to understand him. He was very emotional during the conversation, and he admitted several times that he was drunk. After the defendant was taken into custody (this occurred approximately seven hours after the crash), Hildreth visited him in jail. During the visit, he blamed her for everything and told her that he was drinking

-4-

following the accident because he had a toothache.

¶ 13      Jamie Mitcherson was on the same pool league as the defendant. Prior to the accident, the defendant and Mitcherson were playing pool at Mac and Mick's tavern until approximately 10:30 or 11 p.m. Mitcherson observed the defendant drinking mixed drinks throughout the night, but was unable to say exactly how many drinks the defendant had because he never personally saw the defendant order a drink. He did not know how intoxicated the defendant was that night. However, he did not remember seeing the defendant without a drink in his hand. He had known the defendant for approximately three years, but had never seen him "totally intoxicated."

¶ 14      Chris Modrusic, a Pontoon Beach police officer, was dispatched to 2900 Sand Road because the department had received a call of a fatal hit-and-run accident and a witness had identified the suspect's vehicle at this location. He arrived at the residence at 12:27 a.m. and identified the truck as described by the witness. When he approached the truck, he noticed it had extensive front-end damage and smoke was coming from the engine compartment. As he approached the trailer, he heard someone running around inside.

¶ 15      Gary Brooks, a detective with the Granite City police department, arrived at the trailer after Modrusic. Because he had orders to make contact with the occupant of the trailer, he approached and began knocking on the doors and windows. He heard movement inside the trailer, but no one answered the door. He believed that he knocked on the door off and on pretty loudly for at least one hour. After approximately 30 to 45 minutes, he could hear snoring coming from inside the trailer. The tow truck was eventually impounded by the police department, and he left to make sure the truck was secured inside the department's tow-impound building. He then went to the accident scene and transported the Kia to the impound building before returning to the suspect's trailer to wait for a search warrant. The warrant was not executed until approximately 7:20 a.m. on November 14. After the warrant was obtained, officers entered the trailer and found the defendant inside. The defendant was taken into custody, and Brooks transported him to the Granite City police department.

¶ 16      Kenneth Wojtowicz, a detective with the Granite City police department, had a brief conversation with the defendant before he was transported to the police department. The defendant admitted that he was the driver of the truck.

¶ 17      Later, while at the station, the defendant spoke with Wojtowicz and another officer concerning the events of the past night. He told the officers that he drove his tow truck to Mac and Mick's tavern the previous night to play pool in his pool league. He arrived at approximately 7:30 or 8 p.m. He admitted drinking two to three mixed drinks at the tavern no later than 9 p.m. While at the tavern, he ate some pizza at approximately 9:30 p.m. He left the tavern at approximately 10 p.m. and went to Wal-Mart to get dog food. He told the officers that he never went into Wal-Mart that night because he started feeling "weird" and began experiencing chest pains. He left the Wal-Mart parking lot and drove straight home. He did not have anything to drink once he arrived home. He repeatedly insisted that his truck was not damaged and that he was not involved in an accident. He maintained that he did not remember noticing any damage to his truck. He denied making any phone calls after he returned home and denied that he was intoxicated that night. He also denied hearing the

police officers knocking on his doors and windows. He further denied talking on the phone with a female.

¶ 18     The defendant eventually admitted that he remembered hitting something, backing up, and then going home. He explained that he blacked out and "snapped to" as a result of the crash. However, he left without looking to see what he hit, and he did not know that he hit another vehicle. Once he arrived home, he called Hildreth. He admitted that he talked to Hildreth a second time before the police officers took him into custody, and she informed him that he had hit a person that night.

¶ 19     The officers prepared an alcohol influence report, which indicated that the defendant had red and/or glassy eyes, a dry mouth, and a confused appearance. It also indicated that the officers detected the faint odor of alcohol on his breath. Following the interview, the defendant was taken to the emergency room at Gateway Regional Medical Center because he consented to a blood and urine sample. The parties stipulated that if Dareea Patrick-Paiva, a forensic scientist employed by the Illinois State Police, was called as a witness, she would testify that, within a reasonable degree of scientific certainty, the results of the defendant's blood test would indicate the presence of ethanol at a concentration of 0.020 grams per 100 milliliters.

¶ 20     At trial, Kris Gebke, a traffic crash reconstruction officer with the Illinois State Police, testified that he arrived at the accident scene at approximately 2:30 a.m. on November 14. As part of his reconstruction duties, he surveyed the scene, examined the tow truck and the Kia, and took photographs of the area. He testified that on initial impact, the Kia collapsed from front to rear five feet and the rear frame was exposed. The tow truck pushed the Kia 364 feet and the truck's final resting place was on top of the car's frame. He observed indentations in the road caused by the rear frame of the car being pushed downward into the road, but did not observe any preimpact marks indicating that the tow truck had braked prior to impact. He calculated the postimpact speed of the two vehicles to be 43 miles per hour. He calculated the preimpact speed of the tow truck to be a minimum of 50 miles per hour. He testified that the speed limit on West Pontoon Road was 35 miles per hour. He determined that the defendant did not reduce his speed prior to the collision and that the primary cause of the crash was the defendant's inability to avoid the collision. He concluded that the lights of the Kia were turned off at the time of impact.

¶ 21     Dr. Christopher Long, the director of the St. Louis University School of Medicine forensic toxicology laboratory, testified as an expert in toxicology and retrograde extrapolation. Dr. Long explained that retrograde extrapolation allows for the calculation of a person's unknown BAC when blood is drawn sometime after a particular occurrence. He testified that the formula he used for the retrograde-extrapolation calculation was generally accepted in the field of toxicology. In reaching his conclusions, he analyzed the accident report, deposition testimony from the civil case that resulted from the crash, the defendant's video statement, and the Illinois State Police laboratory report, which indicated that the defendant had a 0.020 BAC 10 hours following the crash. He also considered the defendant's actions on the night of the crash and the police description of the accident. He also discussed the incident with the defendant's neighbor. Dr. Long explained that alcohol is generally metabolized at 0.018 grams per hour. Based on his calculations, he concluded that the

defendant's BAC at the time of the crash was 0.200 grams per 100 milliliters.

¶ 22    Dr. Long testified that a person's height and weight had no effect on retrograde extrapolation, but it should be considered when converting blood alcohol to the number of drinks consumed. He estimated that the defendant had 9 to 11 drinks in his system when the crash occurred. He explained that food would delay absorption of alcohol; however, he opined that the defendant eating a few slices of pizza between 10 and 11 p.m. had no effect on his calculations of the defendant's BAC at the time of the accident. He concluded that the defendant was impaired in his ability to safely and properly operate a motor vehicle at the time of the crash. He maintained that the use of a disinfecting swab containing alcohol would have no effect on the blood test performed by the Illinois State Police. He concluded that the margin of error on the BAC test was low because the blood sample was run in the duplicate, resulting in readings of 0.01999 and 0.02000. He testified that individuals with a BAC of 0.18 to 0.30 exhibited the following symptoms: emotional instability, decreased inhibitions, loss of critical judgment, impairment of memory and comprehension, decreased sensory response, increased reaction time, and some muscular incoordination. Dr. Long noted that these symptoms might not appear in an individual who routinely performs rote tasks under the influence of alcohol, because the body is adaptable. However, when required to perform more than just routine tasks, the impairment would surface.

¶ 23    After the State rested its case, the defense called Mary Sloan to the stand. Sloan testified that she played in the same pool league as the defendant, and she was at the tavern on the night of the incident. She was able to observe the defendant throughout the night, and she noted that he was drinking alcohol but did not exhibit any signs of intoxication.

¶ 24    After leaving Mac and Mick's tavern, the defendant stopped at Sparky 397 Pub (the defendant did not mention this second stop during his police interview). Mark Eddleman testified that his family owned the bar. While working at the bar on November 13, Eddleman was informed that the defendant had parked his tow truck in the center of the bar's parking lot, and it needed to be moved. Eddleman spoke to the defendant between 11:45 and 11:50 p.m. and requested that he move the truck. He estimated that the conversation lasted for a couple of minutes. When asked whether he believed the defendant was intoxicated, he responded: "Intoxicated–maybe–yeah, he probably had a few drinks. I knew he had one at my bar, but did he over-intoxicate where I wouldn't serve him, no." Eddleman was involved in a dramshop case as a result of the crash.

¶ 25    Fred Semke testified as an accident reconstruction expert for the defense. Semke examined the pictures of the crash, the damage to the vehicles, and Gebke's report, which included his calculations on the preimpact and postimpact speeds of the vehicles. He determined that Gebke's conclusion concerning the speed of the tow truck before impact was incorrect. He explained that Gebke's methodology was sound, but opined that Gebke used an incorrect drag factor coefficient of friction in his calculations. Consequently, Gebke's calculation of the defendant's preimpact speed was higher. Semke estimated that the tow truck's speed before impact was between 38 and 47 miles per hour.

¶ 26    Ronald Henson, the defendant's expert in retrograde extrapolation and collection and analysis procedures for blood testing, testified as follows. Henson testified that the margin

of error within a chromatograph could generally be as much as 0.005. He believed that performing two tests would not remove that error because the same machine was used in both tests and the control samples used to calibrate the device usually had a 0.002 margin of error. He claimed that the use of disinfecting swabs containing ethanol could skew the results of the blood test. He noted that he was familiar with independent studies conducted on the disinfecting swabs used in the Illinois State Police DUI kits, and the results from those studies indicated that the residual liquid squeezed out of the swabs contained an ethanol concentration of 0.005.

¶ 27    Henson testified that bacteria could also affect the reading unless precautions were taken to safeguard against contamination in regard to the collection tube and handling of the sample. He explained that the documents he reviewed (and which were relied upon by Dr. Long) provided no explanation regarding the precautions taken when the blood sample was handled. He further explained that the Illinois State Police crime laboratory does not test for any type of microbial contamination or any type of bacterial contamination within the blood sample. He opined that contamination could skew the results of the blood testing by more than 0.02. He also testified that endogenous ethanol in the amount of 0.001 to 0.003 could exist in a person who had consumed no alcohol.

¶ 28    The defendant rested. The State recalled Dr. Long to rebut Henson's testimony concerning the blood test performed by the Illinois State Police. Dr. Long testified that Henson made a mathematical error in calculating the amount of endogenous alcohol that could naturally occur in a person's system. Dr. Long believed that the actual figure of 0.00016 grams was an insignificant number. Based on his review of the Illinois State Police laboratory reports and his training and experience in the field of toxicology, he did not have any doubt regarding the validity of the 0.02 reading in this case. Further, he noted that even if Henson's testimony regarding the 0.005 margin of error in chromatograph machines was accepted, the differences in the retrograde-extrapolation calculations would be insignificant.

¶ 29    Following closing arguments, the trial court stated as follows regarding its decision in the case:

"Without much comment on the strengths and weakness[es] of the case presented or the evidence presented I would say this, that having taken all that as true and understanding the obligation on the Court, the law is the law no matter which way it goes in favor of the State or in favor of the Defendant as applied and interpreted as the trier of fact.

I do state again that I am familiar with the law applicable in this case and have reviewed it again during this trial, pre-trial and again during the trial. I am also satisfied that I understand the evidence and I have reviewed it and considered it, and it is my judgment that the State has met the burden of proof and the Defendant is found guilty as charged."

¶ 30    On March 30, 2011, the defendant filed a motion for judgment of acquittal or in the alternative for a new trial, arguing, *inter alia*, that the State failed to prove the defendant guilty beyond a reasonable doubt (1) of driving under the influence of alcohol, (2) of having a BAC of 0.08 or more, and (3) of driving under the influence of alcohol and thereby

proximately causing the deaths of Donald Legens, Sr., and Donald Legens, Jr.

¶ 31      On April 27, 2011, the trial court denied the defendant's motion and stated as follows:

> "I did give quite a bit of credibility or credence to the expert testimony. I thought in their individual presentation all of the experts, the defense and the State, had something cogent to say and material to offer.

> But I am satisfied with *** the science presented by the State's expert and his thorough knowledge of it. I do think that *** was even demonstrated by his correction on the defense's witness which–wherein he pointed out an error in his calculations which was valid.

> The issue of the extrapolation is–when presented with the right evidentiary substructure, is valid and has been accepted by a lot of Courts. There are ways it can be weakened and ways it can be attacked and ways that it would be found insufficient. But the overview that I had, the opinion that resulted were that the corroborating circumstances, corroborating testimony was such that I did give credence to his interpretation.

> The lay witnesses' testimony I did not find to be so much impeached that it would become unreliable. I think it was sufficient for the points offered.

> *** I didn't find the *** evidence *** as to the possible ramifications of the innate alcohol content in the defendant's system or the alleged skewing of results because of a swab or draw contamination. I accepted, obviously, the summary of Dr. Long and the other evidence as presented in the case that *** did not play a significant part in this matter."

Thereafter, the trial court denied the defendant's motion.

¶ 32      On May 25, 2011, the sentencing hearing was held. The trial court noted that the two convictions for aggravated DUI and the two convictions for aggravated driving with a BAC of 0.08 or more merged for sentencing purposes. The court also noted that the two convictions for failure to report also merged for sentencing. The defendant offered mitigating evidence in the form of testimony and presented a statement in allocution. In announcing the defendant's sentence, the trial court noted, as factors in mitigation, that (1) the defendant had "no great history of prior criminal activity" and (2) the defendant was unlikely to commit another crime. Further, the court noted, as factors in aggravation, that the sentence needed to deter others from committing the same crime. The court noted that the defendant could receive probation under extraordinary circumstances; however, it concluded that extraordinary circumstances were not present in this case.

¶ 33      Thereafter, the trial court sentenced the defendant to 10 years in prison on the aggravated-DUI convictions and 5 years in prison on the failure-to-report convictions. (The court initially sentenced him to 11 years on the aggravated-DUI conviction, but subsequently entered a corrected order reducing the sentence to 10 years.) The sentence for failure to report was to run consecutively to the aggravated-DUI sentence.

¶ 34      On June 10, 2011, the defendant filed a motion to modify and reduce sentence, arguing that the trial court erred at sentencing by denying his request for probation and by failing to

consider all the mitigating factors set forth by him at the sentencing hearing. On July 5, 2011, the trial court denied the defendant's motion. The defendant appeals.

¶ 35    First, the defendant argues the State failed to prove beyond a reasonable doubt that he had a BAC of 0.08 or more. Specifically, he argues that retrograde extrapolation "is in no way reliable enough to prove intoxication beyond a reasonable doubt."

¶ 36    The relevant inquiry when reviewing a challenge to the sufficiency of the evidence is whether, viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Johnson*, 392 Ill. App. 3d 127, 130 (2009). A reviewing court will not reverse a criminal conviction unless the evidence was so unsatisfactory, improbable, or implausible as to justify any reasonable doubt as to the defendant's guilt. *People v. Latto*, 304 Ill. App. 3d 791, 798 (1999). "The trier of fact has the responsibility to determine the credibility of witnesses and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from that evidence." *Johnson*, 392 Ill. App. 3d at 130.

¶ 37    Applying this standard, we find that the evidence was sufficient to support the defendant's convictions for aggravated driving with a blood-alcohol level of 0.08 or more. Although the defendant admits that it is well recognized that Illinois courts have allowed experts to testify about the theory of retrograde extrapolation, he argues that retrograde extrapolation is unreliable to prove intoxication beyond a reasonable doubt. In support of this position, he cites *Mata v. State*, 46 S.W.3d 902 (Tex. Crim. App. 2001) (*en banc*), a Texas court of appeals case that raised concerns about relying on the theory of retrograde extrapolation.

¶ 38    However, we note that this court in *People v. Barham*, 337 Ill. App. 3d 1121, 1133-34 (2003), determined that evidence regarding retrograde extrapolation is admissible as long as it is presented by a qualified expert. In *Barham*, 337 Ill. App. 3d at 1134, this court concluded that the State's expert was not qualified to explain retrograde extrapolation because no evidence was presented to indicate that she was qualified by education, training, or experience. Therefore, this court concluded that the State failed to present any qualified witness "to render an opinion that [retrograde] extrapolation [was] a generally accepted method in the appropriate scientific community, that it produce[d] valid results, and that it could be applied to defendant in this case." *Id.* Because retrograde extrapolation was a complex scientific evaluation, "[e]xpert testimony [was] required initially to establish reliability and then its admissibility and relevance to [the] case." *Id.*

¶ 39    In the present case, Dr. Long's testimony on the theory of retrograde extrapolation was necessary to prove the defendant's BAC at the time of the crash because the defendant left the scene of the crash and remained in his residence until the police were able to execute a search warrant, which did not occur until approximately seven hours after the crash. Dr. Long testified as to his qualifications concerning retrograde extrapolation. He explained that he had been the director of the St. Louis University School of Medicine forensic toxicology laboratory for over 20 years. Prior to that, he was employed as the chief toxicologist for the Illinois State Police and was also employed as a medical examiner for 11 years. He had a bachelor's degree in chemistry, a master's degree in medical biology, a master's degree in

pharmacology toxicology, and a Ph.D. in toxicology. He was also board certified in toxicology. Based on these credentials, the trial court concluded that he was qualified to testify as an expert in the field of toxicology.

¶ 40 Dr. Long then testified that the formula that he used to calculate retrograde extrapolation was generally accepted in the field of toxicology. He testified that he reviewed the accident report, the depositions taken in the civil case regarding this crash, the police report, the video interview with the defendant, the Illinois State Police laboratory report, which indicated that the defendant's BAC was 0.020 approximately 10 hours following the crash, and the coroner's report. He explained the theory behind retrograde extrapolation and the formula used to calculate it. He set forth his calculations for determining that the defendant's BAC was 0.20 at the time of the crash. He noted that he relied on the Illinois State Police's laboratory report in making his calculations, and he had no reason to believe that the tests conducted by the Illinois State Police were contaminated or unreliable.

¶ 41 The record indicates that the trial court was satisfied with Dr. Long's qualifications, the science behind the theory of retrograde extrapolation, and Dr. Long's understanding of the subject. Specifically, the trial court noted that the issue of retrograde extrapolation was accepted as valid by many courts when it was presented with the right evidentiary substructure. The court also noted that it was satisfied with Dr. Long's thorough knowledge of the theory. From our review of the record, we find no reason to disturb the trial court's decision to rely on the testimony of Dr. Long and the theory of retrograde extrapolation. Accordingly, the trial court correctly determined that the State proved the defendant guilty beyond a reasonable doubt of two counts of aggravated driving with a blood-alcohol level of 0.08 or more resulting in two deaths.

¶ 42 Next, the defendant argues that the State failed to prove beyond a reasonable doubt that he was intoxicated at the time of the crash because none of the evidence presented at trial revealed that he exhibited any signs of intoxication. The defendant notes that no witness, aside from Dr. Long, testified that he was intoxicated or displayed any signs consistent with being intoxicated. The State counters that it was not required to show signs of intoxication because the defendant was convicted of driving with a blood-alcohol concentration of more than 0.08 under section 11-501(a)(1) of the Illinois Vehicle Code (625 ILCS 5/11-501(a)(1) (West 2008)), a strict-liability violation. Further, the State argues that overwhelming evidence was presented to support Dr. Long's conclusion that the defendant was intoxicated at the time of the crash. We agree with the State.

¶ 43 Here, the evidence presented at trial was sufficient to support Dr. Long's testimony that the defendant was intoxicated at the time of the crash. First, the record reveals that the defendant left the scene of the crash and drove several miles with the entire front of his truck and headlights missing. He remembered hitting something, but was unaware that he hit a vehicle with enough force to push it 364 feet until it rested on a dirt embankment. Although he denied being intoxicated, he admitted to drinking two or three drinks while he played pool.

¶ 44 Hildreth, the defendant's friend, testified that the defendant repeatedly stated that he was intoxicated when they were talking on the phone on the night of the crash. She characterized

-11-

the defendant's speech as slurred and stated that "he was all over the place." Mitcherson, a member of the defendant's pool team, indicated that he had observed the defendant drinking mixed drinks throughout the night. He also indicated that he did not remember ever seeing the defendant without a drink in his hand. Although he observed the defendant drinking, he was unsure if the defendant was intoxicated. Eddleman, who was facing a dramshop lawsuit as a result of this incident, testified that it appeared the defendant had a few drinks, but he was not "overly intoxicated" to the point that he would not serve him. The defendant was served at least one drink while he was at Eddleman's bar.

¶ 45    The evidence also indicated that when the police interviewed the defendant approximately seven hours after the crash, they detected a faint odor of alcohol on his breath. Further, they described the defendant as having red and/or glassy eyes and a confused appearance. Although the witnesses indicated that the defendant did not exhibit any overt signs consistent with intoxication, the trial court determined that he was guilty of driving under the influence of alcohol on the night of the crash. "On appeal, we will not substitute our judgment for that of a trier of fact in cases where the facts could lead to either of two inferences, unless the inference accepted by the fact finder is inherently impossible or unreasonable." *People v. Lemke*, 349 Ill. App. 3d 391, 398 (2004). Because we do not find the trial court's findings inherently impossible or unreasonable, we find that the State proved the defendant guilty beyond a reasonable doubt of two counts of aggravated DUI resulting in two deaths.

¶ 46    The defendant also argues that Dr. Long improperly relied on the Illinois State Police laboratory report, which indicated that his BAC was 0.020 approximately 10 hours following the crash. Specifically, the defendant argues that Dr. Long was unable to entirely eliminate the possibility that the blood sample might be contaminated. We disagree with the defendant.

¶ 47    The defendant presented expert testimony indicating that the chromatograph could have a margin of error of as much as 0.005 and contamination of the blood sample could result if the proper procedures for handling the sample were not observed. The defendant's expert noted that the laboratory report did not indicate whether these safeguards were taken with regard to the defendant's blood sample. In contrast, Dr. Long testified that he had no reason to question the validity of the 0.020 analysis of the defendant's blood. He indicated that a margin of error in the BAC test was insignificant because the blood sample was run in the duplicate, which resulted in a 0.00001 difference (the first reading was 0.01999 and the second was 0.02000). He testified that even if the 0.005 margin of error in the chromatograph machine was accepted, the difference to the retrograde-extrapolation calculation would be insignificant. The trial court accepted the testimony of Dr. Long and rejected Henson's testimony concerning the possible contamination of the blood sample. The court found Dr. Long's testimony credible and stated it was satisfied with his thorough knowledge of the subject. As previously explained, determinations of witness credibility and resolution of conflicts in evidence are functions for the trier of fact. Therefore, we conclude that sufficient evidence existed to justify the trial court's finding that the defendant was guilty of aggravated driving while under the influence of alcohol resulting in two deaths and aggravated driving with a blood-alcohol level of 0.08 or more resulting in two deaths.

¶ 48    The defendant further argues that the State failed to prove beyond a reasonable doubt that

his intoxication or impairment was the proximate cause of the deaths of Donald Legens, Sr., and Donald Legens, Jr. Specifically, the defendant argues that Donald Legens, Sr.'s actions in dangerously leaving his vehicle in the middle of the road without any headlights was the proximate cause of the crash. We disagree with the defendant.

¶ 49    As explained above, challenges to the sufficiency of the evidence in criminal cases are reviewed by determining whether the evidence is so unsatisfactory, improbable, or implausible as to create a reasonable doubt as to the defendant's guilt. *Latto*, 304 Ill. App. 3d at 798. The offense of aggravated DUI is committed when a person's driving under the influence is a proximate cause of the victim's injuries, not the sole and immediate cause of the injuries. *People v. Merritt*, 343 Ill. App. 3d 442, 448 (2003). "Proximate cause includes both cause in fact and legal cause." *Johnson*, 392 Ill. App. 3d at 131. In the present case, the defendant argues the State failed to present sufficient evidence to prove cause-in-fact proximate cause. The cause-in-fact requirement of proximate cause is present when reasonable certainty exists that the defendant's actions caused the injury or damage. *Id.*

¶ 50    Here, the defendant was found guilty of two counts of aggravated driving with a BAC of 0.08 or more resulting in two deaths and two counts of aggravated driving under the influence of alcohol resulting in two deaths. Section 11-501(a)(1) of the Illinois Vehicle Code (625 ILCS 5/11-501(a)(1) (West 2008)) provides that a person shall not drive or be in actual physical control of any vehicle while the alcohol concentration in the person's blood is 00.08 or more. Section 11-501(a)(1) is a strict-liability violation and does not require proof of impairment. *People v. Martin*, 2011 IL 109102, ¶ 26. Because proof of impairment is not required under this section, proximate cause requires the State to show a causal link between the physical act of driving and another person's death. *Id.* However, the State may be required to prove impairment under certain aggravated-DUI charges. "[W]hether proof of impairment is necessary to sustain a conviction for aggravated DUI under section 11-501(d)(1)(F) depends upon whether impairment is an element of the underlying misdemeanor DUI." *Id.* A person commits aggravated DUI under section 11-501(d)(1)(F) of the Illinois Vehicle Code (625 ILCS 5/11-501(d)(1)(F) (West 2008)) when the person is driving a vehicle under the influence of alcohol and that results in the death of another person. The DUI violation must be the proximate cause of the death. 625 ILCS 5/11-501(d)(1)(F) (West 2008). When the underlying misdemeanor DUI is driving under the influence of alcohol (625 ILCS 5/11-501(a)(2) (West 2008)), impairment is an element of the offense. Because impairment is an element of this offense, the State must show that impairment was a proximate cause of the death. See *Martin*, 2011 IL 109102, ¶ 26.

¶ 51    In this case, the defendant argues that the State failed to prove that his actions of driving under the influence of alcohol or driving with a BAC of 0.08 or more was the proximate cause of the deaths of Donald Legens, Sr., and Donald Legens, Jr. The defendant notes that Donald Legens, Sr., created a dangerous situation by parking his darkly colored vehicle on the road with no headlights at night. In support of his argument, the defendant points to Yount's testimony that she did not observe the SUV until she was two car lengths away, and she was forced to swerve into another lane to avoid hitting it. However, as noted by the trial court, this fact also indicates the opposite, *i.e.*, that a sober driver, driving the speed limit, had time to react and take evasive action. The record reveals that the defendant failed to take

-13-

any evasive action to avoid the crash. The State's accident reconstructionist testified that the defendant never applied his brakes, his preimpact speed was a minimum of 50 miles per hour, and he pushed the Kia 364 feet until it was stopped by a dirt embankment. The defendant admitted to his friend that he was drunk and that he had blacked out. Several witnesses testified that he was drinking on the night of the accident. As previously explained, the State presented sufficient evidence to prove the defendant was intoxicated at the time of the crash. Accordingly, the State presented sufficient evidence to prove beyond a reasonable doubt that the defendant's actions of physically driving the tow truck and of driving under the influence of alcohol caused the deaths of Donald Legens, Sr., and Donald Legens, Jr.

¶ 52 The defendant also argues that his sentence was an abuse of discretion. Specifically, he argues the trial court failed to consider all the mitigating factors that were presented by him during sentencing, and the court abused its discretion by denying his request for probation as he proved extraordinary circumstances existed to justify a sentence of probation.

¶ 53 We initially note that the State filed a motion to cite additional authority, which this court ordered taken with the case on May 4, 2012. In its motion, the State sought permission to cite *People v. Hill*, 2012 IL App (5th) 100536, as support for its argument that this case did not warrant a sentence of probation. We hereby grant the State's motion and consider the *Hill* case when determining whether the trial court abused its discretion in denying the defendant's request for probation.

¶ 54 The legislature has established the range of sentences permissible for a particular offense. *People v. Fern*, 189 Ill. 2d 48, 53 (1999). "Within that statutory range, the trial court is charged with fashioning a sentence based upon the particular circumstances of the individual case, including the nature of the offense and the character of the defendant." *Id.* at 55. A trial court's sentencing determination is given great deference because that court, having observed the defendant and the proceedings, is in a better position to consider the particular circumstances of each case, such as the defendant's credibility, demeanor, general moral character, mentality, social environment, and habits. *People v. Winningham*, 391 Ill. App. 3d 476, 485 (2009). Therefore, the reviewing court must proceed with great caution when considering the trial court's sentence, and it must not substitute its own judgment for that of the trial court just because it would have weighed the factors differently. *Id.* "A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *Fern*, 189 Ill. 2d at 54. Accordingly, a reviewing court may not reduce the defendant's sentence unless the sentence constitutes an abuse of discretion. *Winningham*, 391 Ill. App. 3d at 485.

¶ 55 Pursuant to section 11-501(d)(2)(G)(ii) of the Illinois Vehicle Code (625 ILCS 5/11-501(d)(2)(G)(ii) (West 2010)), a person convicted of aggravated DUI, which resulted in the death of two or more persons, shall be sentenced to a term of imprisonment of not less than 6 years and not more than 28 years unless the court determines that extraordinary circumstances exist and require probation.

¶ 56 In the instant case, the defendant argued that seven factors in mitigation were present in this case, *i.e.*, he did not contemplate that his criminal conduct would cause or threaten

serious physical harm to another, substantial grounds existed to justify his criminal conduct, he cooperated with a civil suit brought by the victim's wife as a result of this crash, he had no history of prior delinquency or criminal activity, his criminal conduct was the result of circumstances unlikely to reoccur, his character and attitude indicated that he was unlikely to commit another crime, and he was particularly likely to comply with the conditions of probation.

¶ 57    After reviewing all the evidence, the trial court determined that not "much of what [the defendant argued] really [resulted] in mitigation." Instead, the court considered, as factors in mitigation, that the defendant had no history of prior criminal activity and that he was unlikely to commit another crime. After carefully considering the circumstances surrounding the accident, the mitigating and aggravating factors, the arguments concerning sentencing alternatives, and the presentence report, the court sentenced the defendant to 10 years' imprisonment on the aggravated-DUI convictions. Given our highly deferential standard of review, we conclude that the trial court's consideration of only two of the seven mitigating factors presented by the defendant was not an abuse of discretion.

¶ 58    Also, during sentencing, the defendant requested that the trial court sentence him to probation because he proved the existence of extraordinary circumstances. Specifically, the defendant noted that he was not the sole cause of the vehicle crash. Instead, the defendant argues that Donald Legens, Sr.'s decision to take his infant son out at midnight and park his vehicle in the road with no illumination was a factor in the accident. He also noted that the evidence revealed that Legens was intoxicated and had cocaine in his system at the time of the crash.

¶ 59    As explained above, the trial court can impose a sentence of probation for an aggravated DUI involving a death when extraordinary circumstances are present. However, the existence of extraordinary circumstances is rare. *Winningham*, 391 Ill. App. 3d at 483. "The extraordinary circumstances required for probation are matters for the trial court's discretion." *Hill*, 2012 IL App (5th) 100536, ¶ 28. In *Hill*, 2012 IL App (5th) 100536, ¶ 27, the defendant argued that extraordinary circumstances, *i.e.*, he was induced to drink alcohol and drive while intoxicated at the victim's suggestion, warranted that he receive a sentence of probation. This court concluded that extraordinary circumstances were lacking and that the defendant's "attempt to blame the victim for his own choices *** [was] without merit and *** not worthy as a mitigating factor." *Id.* ¶ 28.

¶ 60    After carefully reviewing the record, we agree with the trial court that extraordinary circumstances are lacking in this case. The defendant's decision to drive while intoxicated resulted in the deaths of Donald Legens, Sr., and Donald Legens, Jr. The evidence indicated that the defendant did not take any evasive action to avoid the crash, his tow truck pushed the Kia 364 feet before it rested on an embankment, he did not remember hitting a vehicle, and then he drove off without checking on the occupants of the vehicle. The fact that Donald Legens, Sr., was intoxicated and had parked his vehicle in the road with no illumination does not constitute extraordinary circumstances to warrant the defendant receiving a sentence of probation. Therefore, we find that the trial court's sentence of 10 years' imprisonment does not amount to an abuse of discretion.

¶ 61    For the foregoing reasons, the judgment of the circuit court of Madison County is hereby affirmed.

¶ 62    Affirmed.